**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **NRT TECHNOLOGY CORP. and** | ) | |
| **NRT TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. _____** |
| | ) | |
| **EVERI HOLDINGS INC.,** | ) | |
| **f/k/a Global Cash Access Holdings, Inc. and** | ) | |
| **EVERI PAYMENTS INC.** | ) | **JURY TRIAL DEMANDED** |
| **f/k/a Global Cash Access, Inc.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR VIOLATIONS OF**
**SECTION 2 OF THE SHERMAN ANTITRUST ACT**

## NATURE OF ACTION

1.      Plaintiffs NRT Technology Corp. ("NRT CA") and NRT Technologies, Inc. ("NRT US") (collectively "Plaintiffs" or "NRT") bring this civil action against Defendants Everi Holdings Inc. and Everi Payments Inc. (collectively "Defendants" or "Everi") for violations of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 1 *et seq.*).

2.      Plaintiffs' claims are based upon at least: (a) Defendants' (including their predecessors in interests and officers and agents of the same) wrongful, knowing, intentional, and willful enforcement of an invalid and unenforceable patent fraudulently procured from the United States Patent and Trademark Office ("USPTO") by the wrongful, knowing, intentional, and willful failure to disclose known material prior art that Defendants knew or had reason to know would cause said patent to be found invalid; (b) Defendants' (including their predecessors in interest) frivolous and vexatious patent litigation, which included the assertion of objectively baseless claims to enforce the aforementioned patent that Defendants knew to be invalid and unenforceable with the specific intent to directly interfere with and adversely affect the business operations of competitors, including NRT, by way of predatory and anticompetitive acts in an attempt to unlawfully obtain, increase, and/or maintain significant and durable market power over the U.S. market for unmanned, integrated kiosks providing certain automatic teller machine (ATM) and/or cash access services to casino patrons on the casino and/or gaming facility floor, including but not limited to cash advance, POS debit, credit card, and ATM transactions (the "Relevant U.S. Market") from that time period inclusive of but not limited to at least May 1, 2015 through January 15, 2018; and (c) Defendants' other conduct undertaken with the specific intent to directly interfere with and adversely affect the business operations of competitors, including NRT, by way of predatory and anticompetitive acts in an attempt to unlawfully obtain,

1

increase, and/or maintain significant and durable market power over the aforementioned Relevant U.S. Market from that time period inclusive of but not limited to at least May 1, 2015 through January 15, 2018.

## JURISDICTION AND VENUE

3.      This action arises under the antitrust and patent laws of the United States of America, including Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26), the United States Patent Act (35 U.S.C. § 102-103), and Section 1.56 of Title 37 of the Code of Federal Regulations.   This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15, 26, and 1121 and 28 U.S.C. §§ 1331, 1337, and 1338.

4.      This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. § 22; 28 U.S.C. §1391(b), (c), and (d); the long-arm statutes of the State of Delaware; and the Due Process Clause of the United States Constitution.   Defendants regularly conduct business in this state and district, "reside" in this jurisdiction, and committed acts invoking or otherwise violating U.S. patent and antitrust laws in this state and district.   A substantial part of the events giving rise to the claims asserted occurred in this district and the impact of the aforementioned violations included a substantial lessening of competition in the Relevant U.S. Market, which encompasses this district.   Defendants inflicted substantial harm to Plaintiffs' business, revenues, and profits as a result of certain predatory and anticompetitive activities that arose within this district.   Defendants also have and maintain agents in this district. The foregoing evidences "minimum contacts" with this state and district by Defendants.

5.      Venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) and (2), (c)(2), and (d); and 15 U.S.C. §§15 and 26.   Defendants and each of them are corporations

2

organized and existing under the laws of the State of Delaware.  Defendants are presumed to be operating in accordance with the Delaware General Corporation Law.  Defendants are each subject to personal jurisdiction in this state and district in that they "reside" in this state and district.  A substantial part of the events giving rise to the asserted claims arose in this state and district.

## THE PARTIES

6.      Plaintiff NRT Technologies, Inc. is a corporation organized and existing under the laws of the state of Nevada.  Plaintiff NRT Technologies, Inc. has its principal place of business at 3525 E. Post Road., Las Vegas, Nevada 89120.  Plaintiff NRT Technologies, Inc. does business throughout the United States.

7.      Plaintiff NRT Technology Corp. is a corporation organized and existing under the laws of Canada.  Plaintiff NRT Technology Corp. has its principal place of business at 10 Compass Court, Scarborough, Ontario, Canada M1S 5R3.  In conjunction with NRT Technologies, Inc., Plaintiff NRT Technology Corp. does business throughout the United States.

8.      Plaintiffs provide cash access solutions for gaming and casino facilities.  These solutions allow guests to quickly, easily, and securely complete numerous cash access options, including ATM, credit and debit cash advance.  Cash access is critical to the success of gaming and casino facilities.  Plaintiffs' cash access solutions connect gaming and casino facility guests to their respective financial institutions with industry leading up-time made possible by reliable and efficient payment processing infrastructure and unmatched customer support.

9.      Defendant Everi Holdings Inc. (f/k/a Global Cash Access Holdings, Inc.) is a corporation organized and existing under the laws of the state of Delaware.  Defendant Everi Holdings Inc. has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas,

68387213.1

Nevada 89113.  Defendant Everi Holdings Inc. does business in this judicial district and state and elsewhere throughout the United States.

10.     Defendant Everi Payments Inc. (f/k/a/ Global Cash Access, Inc.) is also a corporation organized and existing under the laws of the state of Delaware.  Defendant Everi Payments Inc. also has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas, Nevada 89113.  Defendant Everi Payments Inc. does business in this judicial district and state and elsewhere throughout the United States.

11.     Defendant Everi Holdings Inc. caused its name to be changed from Global Cash Access Holdings, Inc. effective August 24, 2015.  Defendant Everi Payments Inc. caused its name to be changed from Global Cash Access, Inc. effective August 24, 2015.  Defendant Everi Holdings Inc. is a holding company, the assets of which are the issued and outstanding shares of capital stock of *inter alia* Defendant Everi Payments Inc.  Defendant Everi Holdings Inc. is traded on the New York Stock Exchange.  Defendant Everi Holdings Inc. makes no cognizable distinction nor does it attempt to make any cognizable distinction by and between itself and Defendant Everi Payments Inc.  Defendant Everi Holdings Inc. has as recently as its Form 10-K for the fiscal year ended December 31, 2018 referred to itself as well as "its consolidated subsidiaries" (including Defendant Everi Payments Inc.) as "the 'Company,' 'we,' 'us,' and 'our.'"

12.     Plaintiffs believe that Defendants Everi Payments Inc. and Everi Holdings Inc. (including any respective predecessors in interest)—either individually and/or in concert with one another—engaged in each and every one of the complained of predatory and anticompetitive acts set forth herein.  More specifically, Plaintiffs do not believe that either entity undertook any of said actions without the knowledge, ratification, and/or express or inherent authorization of

the other.  Plaintiffs further allege that the State of Delaware recognizes that when the acts of two or more entities concur in producing a single indivisible injury, such entities are jointly and severally liable regardless of whether there is no common duty, common design, or concerted action.  Plaintiffs further allege that the joint and several liability of two codefendants (such as Defendants Everi Holdings and Everi Payments) entitles a plaintiff or plaintiffs (such as NRT CA and/or NRT US) to seek recovery from either or both of the defendants.  For each and every allegation and cause of action set forth herein, Plaintiffs NRT CA and NRT US, and each of them, contend that they are entitled to seek recovery from either or both of the identified Everi Defendants and hereinafter refers to them as 'Defendants,' 'Everi,' or 'Defendant Everi' with the foregoing in mind.

13.    Plaintiffs and the Relevant U.S. Market have been damaged by the actions of Defendants as set forth below.

## FACTUAL BACKGROUND

14.    Gaming and casino facilities routinely offer automatic teller machine (ATM) and cash access services.  Such facilities provide these cash access services to their patrons through gaming-specific kiosks intended for use in casinos and gaming facilities both 'in house' as well as on the gaming or casino floor.  These gaming-specific kiosks are self-service machines that allow guests and patrons to withdraw cash from their bank accounts, take a cash advance on their credit cards, and/or purchase tickets or vouchers that can be redeemed for chips at the casino cage.  These gaming-specific kiosks allow guests and customers to withdraw money and subsequently pay for goods, services, and otherwise engage in entertainment experiences when the daily allowed withdrawal limit for a particular account has been reached.  As a result of said functionality, a guest or customer may continue to enjoy or acquire goods or services and

otherwise continue to partake in any given entertainment experience offered by the gaming or casino facility.

15.     The gaming and casino industry is subject to pervasive regulation inclusive of state and local laws, rules, regulations, and official entities.  Such laws, rules, and regulation are meant to ensure that gaming and related services are conducted and provided honestly and free of corruptive elements.  These laws, rules, and regulations seek to protect consumers and the viability of the gaming and casino industry by maintaining public confidence, preventing cheating and fraud, and establishing and maintaining responsible accounting practices and procedures through controls over financial transactions and record keeping.  As a result, these gaming-specific kiosks often require regulatory approval by state and/or local gaming authorities.  These specialized and multi-function gaming-specific kiosks for gaming and casino facilities and the certified software executing thereupon are not readily interchangeable or subject to substitution with the likes of a traditional banking ATM.

16.     In 2016, which is inclusive of the time period at issue with respect to Defendants' predatory and anticompetitive actions, the United States had approximately 400 land-based and 500 tribal casinos.  These more than 900 casinos utilize such gaming-specific kiosks, approved by appropriate state and local regulatory agencies, to provide ATM and/or cash access services to their patrons.  Gaming facilities and casinos demand such multi-function self-service kiosks because they reduce labor costs, shorten the time required for patrons to obtain cash or chips to return to the gambling floor, and increase the amount of gambling currency a patron can access in any given day.  Without such kiosks, gaming facilities and casinos would need to hire additional employees to handle cash or chip access services, suffer delays in providing patron access to cash or chips, as well as potentially find its patrons subject to the imposition of daily

68387213.1

and often arbitrary ATM withdrawal limits.  Any decrease in the amounts that patrons can bet per day adversely affects the profitability and viability of gaming facilities and casinos.

17.     During at least the May 1, 2015 through January 15, 2018 time period at issue with respect to the predatory and anticompetitive acts complained of herein, Everi possessed, maintained, and controlled significant and durable market power in the Relevant U.S. Market. During at least the May 1, 2015 through January 15, 2018 time period at issue with respect to the predatory and anticompetitive acts complained of herein, Everi did exercise and undertake efforts to maintain that significant and durable market power through a variety of predatory and anticompetitive acts.  It is only now—in 2019—that the Relevant U.S. Market is recovering from the adverse effects of Defendants' predatory and anticompetitive acts.

18.     Such recovery in the Relevant U.S. Market includes but is not limited to the inability of Everi to continue engaging in certain predatory and anticompetitive acts related to U.S. patent number 6,081,792.  A true and correct copy of U.S. patent number 6,081,792 (the "'792 Patent") is attached hereto as **EXHIBIT A**.  The '792 Patent was procured through fraud and deception on the USPTO by Defendants and their predecessors in interest.  This fraud included the intentional failure by Everi and its predecessors to disclose material prior art to the USPTO.

19.     These predatory acts further included the wrongful, knowing, intentional, and willful enforcement of the '792 Patent against participants in the Relevant U.S. Market, including but not limited to Plaintiffs.  These predatory acts still further included the assertion of objectively baseless claims that no reasonable litigant could have expected to succeed on the merits and that were motivated with the intent to directly interfere with participants in the Relevant U.S. Market, including but not limited to Plaintiffs.  It was only after Plaintiffs *twice* invalidated the claims of the '792 Patent in two different venues following two expensive, time

consuming, and disruptive litigation proceedings that Everi ceased utilizing the '792 Patent in a manner that gave rise to predatory and anticompetitive behavior.

**A.    Defendant's Predatory Acts to Create and Maintain Significant and Durable Market Power in the Relevant U.S. Market**

**1.    Procurement of the '792 Patent through Fraud on the USPTO**

20.    NRT believes that Everi and those authorized to act on its behalf knew that the purported invention claimed in the '792 Patent was in public use, on sale, or otherwise available to the public in as early as 1996 (*i.e.*, more than one year before the filing date of the application that later became the '792 Patent—January 15, 1998).  Section 102(b) of the Patent Act in force at the time the predecessors in interest to Everi sought said patent states that "[a] person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of application for patent in the United States."  The fact that the purported invention claimed in the '792 Patent was in use, on sale, and otherwise available to the public would have invalidated the '792 Patent under 35 U.S.C. § 102 of the United States Patent Act.  Alternatively, the purported inventions would have been found obvious under Section 103.

21.    In particular, and according to a June 3, 2009 *Notice of Intent to Deny State Certification* available from the Arizona Department of Gaming and publically accessible from the World Wide Web, in as early as 1996, Global Cash Access (the predecessor in interest to Everi) was providing "products and services allow[ing] gaming patrons to access funds at casinos" including "approximately twenty (20) Tribal casinos within the exterior boundaries of [the State of] Arizona."  A true and correct copy of the *Notice* is attached hereto as **EXHIBIT B**. At issue in the *Notice* were certain interchange fees (*i.e.*, transaction fees) related to "'quasi-cash transactions which result in the issuance of a money order to a casino patron."  These transactions involve "negotiable instruments that are directly convertible to cash, such as

8

WTMOs."  WTMOs (Wire Transfer Money Orders) are processed "when a patron uses a Visa credit card from an issuing bank at a [Global Cash Access] GCA terminal"; the transaction is "captured and . . . route[d] . . . to the patron's issuing bank through Visa" and "GCA's authorization processor."  The issuing bank "either sends an approval or denial message back . . . to GCA's terminal" where, "[i]f the transaction is approved," the patron is instructed "to go to the casino cashier cage, where a money order is printed which the patron can exchange for cash to use in the casino."

22.     This system allowed casino patrons (in 1996) that had reached a spending limit or that had otherwise expended funds to "get cash using their credit cards" whereby a patron would "not directly receive cash as a result of a cash-advance (loan) transaction, but instead buy[s] a money order redeemable only at the casino."  This system (and the methods implemented and made possible by the same) are encompassed by at least independent claims 1 and 9 of the '792 Patent, which were sought two years later in 1998.  This system—available in 1996—discloses the entirety of the system allowing for the performance of the methods recited by the aforementioned claims of the '792 Patent, which were—again—sought two years later in 1998 in direct contravention of the U.S. Patent Act.  Alternatively, this system evidences the obviousness of such a system and corresponding methodology in light of the same.

23.     The named inventors in the '792 Patent—Robert P. Cucinotta and Karim Maskatiya—were both aware of this prior art system and method performed by the same.  The aforementioned *Notice* unambiguously states that "Robert Cucinotta was one of GCA's founders and was involved throughout in managing the Visa interchange fee matter at issue" in said *Notice*.  The *Notice* further states that Cucinotta "was 'absolutely knowledgeable' of credit card transaction processing."  Said *Notice* also stated that "[e]veryone knew" about the system and

corresponding payment processing methods that gave rise to the Arizona Department of Gaming's investigation. 'Everyone,' per the *Notice*, included both Karim Maskatiya and Robert Cucinotta. Mr. Maskatiya, per said *Notice,* was "involved in the running of the company"; both of the inventors were also found to "control[] GCA" during the time period in question, which pertains directly to material prior art concerning existing systems and methods not otherwise disclosed to the USPTO during prosecution of the '792 Patent.

24. The publically available June 3, 2009 letter from the Arizona Department of Gaming (**EXHIBIT B**) makes clear that the predecessor to Everi (GCA) was processing these transactions no later than 1996. These transactions, again, allowed casino patrons to obtain cash advances from financial institutions after patrons had met their daily transaction or withdrawal limits. These are the very same transactions that were alleged to infringe the independent claims of the '792 Patent in various litigations brought against Plaintiff NRT and further described below. But despite being aware of the above described existence of prior art, GCA, Karim Maskatiya, and Robert Cucinotta—as well as the attorneys and agents who prosecuted the application that matured into the '792 Patent—failed to disclose said prior art to the USPTO.

25. This failure was not without consequence. A reasonable examiner would have been substantially likely to consider the prior art disclosed in the Arizona Department of Gaming letter important in deciding whether to allow the application for the '792 Patent. The '792 Patent and prior art identified by the Arizona Department of Gaming both relate to accessing cash from financial institutions after certain withdrawal or cash advance limits have been reached.

26. But for GCA and its officers and representatives having failed to disclose this information to the USPTO, a reasonable examiner would have been unlikely to allow the application that became the '792 Patent. Upon information and belief, Cucinotta and Maskatiya

as co-founders, authorized agents, and officers for the predecessor in interest to Everi (as well as their representatives and agents at the time) knew of the above referenced prior art and knew of its materiality to the '792 Patent.  The foregoing individuals and entities (and each of them) intended to deceive the USPTO by failing to disclose said material prior art to the USPTO.

27.     The '792 Patent is rendered unenforceable as a result of Cuccinotta and Maskatiya, if not others on behalf of and with the knowledge of GCA, and its officers, and agents, having intentionally and fraudulently concealed prior art systems like those disclosed in the publically available Arizona Department of Gaming letter from the USPTO during prosecution.  Said individuals (on behalf of their corresponding corporate enterprise) did so with the intent and expectation that the '792 Patent would issue but for disclosure of the material prior art.  The issuance of the '792 Patent and its subsequent enforcement and threatened enforcement against third-parties in the Relevant U.S. Market, including but not limited to NRT, deterred or otherwise interfered with entry into the Relevant U.S. Market.  Such deterrence further gave rise to and otherwise expanded Everi's (and its predecessor's) significant and durable market power from that time period inclusive of but not limited to at least May 1, 2015 through January 15, 2018.

### 2.     Sham Litigation Asserting Fraudulently Acquired '792 Patent

28.     In addition to having knowingly and fraudulently acquired the '792 Patent, Defendants later committed patent misuse by asserting that patent against NRT.  Defendants made such assertion with full knowledge that the '792 Patent was deceptively and fraudulently acquired.  Defendants did so knowingly full well, too, that the assertions raised in its fraudulently acquired patent were objectively baseless and had no basis of success either as a matter of infringement and/or (in)validity.  Everi made these assertions with an aim to acquire or otherwise

11

maintain significant and durable market power in the Relevant U.S. Market as well as to interfere directly with the business relationships of Plaintiff NRT as well as others attempting entry into the Relevant U.S. Market.

29.     Specifically, on May 1, 2015, Everi filed a complaint in the United States District Court for the District of Nevada accusing NRT of infringement of the '792 Patent.  *See Global Cash Access, Inc. v. NRT Technology Corp.*, (D. Nev. C.A. No. 2:15-cv-00822).  A true and correct copy of the initiating complaint in the district court action is attached hereto as **EXHIBIT C**.  Shortly thereafter, on May 4, 2015—with the Nevada action already pending—Everi commenced another action, this time with the International Trade Commission (ITC), accusing NRT of infringement of the same '792 Patent.  *See In re Certain Automated Teller Machines & Point of Sale Devices & Associated Software Thereof* (Inv. No. 337-TA-958).  A true and correct copy of the initiating complaint in the ITC action is attached hereto as **EXHIBIT D**.  The ITC Action was substantively similar and all but identical to the allegations raised in the May 1, 2015 action filed in the District of Nevada.  Both actions asserted the intentionally and fraudulently acquired '792 Patent against both NRT CA and NRT US for the purposes of acquiring or otherwise maintaining significant and durable market power in the Relevant U.S. Market as well as interfering with the business relationships of Plaintiffs and other parties in the Relevant U.S. Market.

30.     The '792 Patent is directed to a system and method for withdrawing money from a financial institution when the daily withdrawal limit set by that financial institution has been met.  Everi's predecessor (GCA) was already processing the same or substantially equivalent transactions in 1996.  These transactions were being processed (*i.e.*, were publically in use) more than one year before the filing date of the application for the '792 Patent.  The named inventors

of the '792 Patent are the co-founders of Everi's predecessor in interest (GCA).   The named

inventors were officers and agents for Everi's predecessor interest (GCA).   Everi—by way of its

predecessor in interest—therefore knew about these prior art systems processing the later

claimed accused transactions.

31.     Concealment of these prior art systems from the USPTO during prosecution of the

application that became the '792 Patent led to the USPTO failing to consider said prior art,

which would have otherwise led the USPTO to conclude that the '792 Patent was anticipated or

at least rendered obvious by the material prior art.   Disclosure of the prior art systems disclosed

and discussed by the Arizona Department of Gaming during prosecution of the application that

became the '792 Patent would have, therefore, necessarily prevented the '792 Patent from being

issued.   NRT is informed and believes, and thereon alleges, that said acts were undertaken by

Everi, its predecessors in interest, and/or those authorized to act on its behalf with the intent and

expectation that the '792 Patent would deter entry into the cash access and cash handling market

in the United States, specifically providing certain automatic teller machine (ATM) and/or cash

access services to casino patrons on the casino and/or gaming facility floor, including but not

limited to cash advance, POS debit, credit card, and ATM transactions.   Such deterrence

effectively and impermissibly created or otherwise extended significant and durable market

power in the Relevant U.S. Market and held by Everi from that time period inclusive of but not

limited to at least May 1, 2015 through January 15, 2018.

32.     On March 22, 2016, the United States International Trade Commission

determined that the asserted claims of the '792 Patent were invalid as indefinite pursuant to 35

U.S.C. § 112.   A true and correct copy of this determination is attached hereto as **EXHIBIT E**.

The International Trade Commission not only found that there was "no genuine issue as to any

material fact" in arriving at said finding of indefiniteness but also stated that arguments to the contrary and proffered by Everi to be "not credible."  A true and correct copy of the *Notice of Commission* decision addressing the lack of credibility in Everi's arguments is attached hereto as **EXHIBIT F**.  On June 1, 2016, Everi filed an unopposed motion to terminate the ITC investigation in its entirety by withdrawal of the complaint in accordance with 19 C.F.R. § 210.21(a)(1).  On June 2, 2016, the ITC granted the motion terminating the investigation.  A true and correct copy of that decision and addressing Everi's voluntary withdrawal of the same is attached here as **EXHIBIT G**.

33.    Concurrent with the invalidation of the '792 Patent by the International Trade Commission, the United States District Court for the District of Nevada similarly found the '792 Patent to be invalid.  In the Nevada matter, the United States District Court found (on March 25, 2016), that the '792 Patent lacked statutory subject matter and was invalid under Section 101 of the Patent Act.  A true and correct copy of the order invalidating the '792 Patent is attached hereto as **EXHIBIT H**.  Like the International Trade Commission decision, there was no appeal to the United States Court of Appeal for the Federal Circuit.  Defendants' sham litigations were effectively at an end.

34.    In bringing both the Nevada District Court and ITC actions, Everi accused NRT of infringing the '792 Patent and engaging in otherwise undefined acts of 'unfair competition.' Everi was repeatedly warned that its case was weak and lacked merit.  On July 20, 2015—little more than two months after Everi's litigation campaign commenced—NRT clearly and unambiguously advised Everi that the '792 Patent was (1) not infringed, (2) subject to invalidation by ample prior art (an example of which was attached to said correspondence), and (3) an example of an "abstract financial business method patent[]" deemed unpatentable in light

of the Supreme Court's holding in *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct 2347 (2014).

Everi also was advised:

> The facts and governing law here confirm by a preponderance of the evidence
> that [Everi] has an exceptionally weak patent and may be using it in bad faith,
> hoping to unfairly prevent U.S. customers from using NRT's products and
> services.  NRT invites [Everi] to consider withdrawing its meritless claims
> before attorneys' fees are assessed against it or its attorneys.  In particular, we
> request that you discuss the foregoing with [Everi] and its owners to determine
> whether this matter may be resolved before further judicial, ITC, and client
> resources are expended.

But Everi carried on with its objectively baseless cases despite the fact that Everi knew or should

have known that it lacked a good faith basis to bring a federal patent claim in the District of

Nevada as well as before the International Trade Commission.  Such knowledge made any

suggestion that Everi possessed a meritorious patent claim impossible.  Everi simply elected to

use the district court and the ITC as a tool for extortion-like tactics to further its own commercial

motives and to otherwise maintain or further establish significant and durable market power in the

Relevant U.S. Market or to otherwise directly interfere with the business relationships of

participants in the Relevant U.S. Market, specifically NRT.

35.    Although the issue of unenforceability and fraud on the Patent Office were not

litigated to a final determination in a district court, Everi's efforts to enforce a clearly invalid and

unenforceable patent against NRT for the intended purpose of driving NRT out of the Relevant

U.S. Market amounts to sham litigation brought in bad faith to achieve predatory and

anticompetitive objectives during that time period inclusive of but not limited to at least May 1,

2015 through January 15, 2018.  The above referenced frivolous litigation against NRT was not

an isolated incident.  It was a continuation of Everi's longtime strategy of vexatious and

frivolous litigation against any number of existing or potential competitors and to exhaust

smaller competitors' limited resources on costly litigation such that they would be forced to either settle the litigation to their detriment in the Relevant U.S. Market or agree to be acquired by Defendants thereby maintaining or further establishing significant and durable market power in the Relevant U.S. Market on behalf of Everi and its predecessors.

36.     For example, the aforementioned finding of invalidity coupled with total capitulation before the ITC failed to wholly end Everi's litigation campaign against NRT. Everi's efforts carried on with respect to a spurious unfair competition claim related to what can only be characterized as 'defamation' of the now invalidated '792 Patent.  On April 15, 2016 NRT wrote a further letter to Everi asking Plaintiff to terminate the litigation, specifically the remaining tort claims.  In that letter, NRT made clear that Everi "knew or should have known that it lacked a good faith basis to bring a federal patent claim in the United States District Court, District of Nevada."

37.     Despite multiple defeats and multiple warnings, Everi continued to assert an objectively baseless case.  It was only on October 19, 2017 when NRT noticed the depositions of nine then-Everi employees coupled with a third-party subpoena to its former CEO—the same CEO that authorized commencement of the sham litigations against NRT—that Everi realized even it could no longer sustain this objectively baseless action.  Everi voluntarily stipulated to dismiss the action a week later on October 24, 2017.

38.     Everi's claims of infringement and unfair competition rang as hollow on May 1, 2015 as they did on October 24, 2017.  These actions should simply never have been brought.  And Everi was presented with numerous opportunities to dismiss in light of ample evidence to its detriment.  But Everi instead continued its fight and incurred significant expense to NRT.  And notwithstanding NRT's complete and total victory over Everi, NRT is informed and believes that

certain representatives of Everi continued to make representations that the twice invalidated '792 Patent was still enforceable and/or that NRT was otherwise unable to perform certain transactions that Everi contended to be covered by said invalidated patent.  This behavior should not be allowed or encouraged in the future.  A proper deterrent requires the imposition of treble damages against Everi for its efforts to maintain or further establish significant and durable market power in the Relevant U.S. Market for that time period inclusive of but not limited to at least May 1, 2015 through January 15, 2018.

39.     NRT is informed and believes and thereon alleges that by virtue of the predatory and anticompetitive conduct discussed above, Defendant Everi was able to maintain significant and durable market power in the Relevant U.S. Market from at least May 1, 2015 through January 15, 2018.  Everi's significant and durable market power in the Relevant U.S. Market from at least May 1, 2015 through January 15, 2018 did not occur by virtue of superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions.  Instead, it occurred as the result of Everi's purposeful abuse of the patent system and the judicial process.  As a result of Defendants' actions, potential competitors could not enter the Relevant U.S. Market without a multi-million dollar war chest and a business plan that includes millions in upfront litigation costs as part of its anticipated start-up expense.

40.     Through its predatory patent litigation and patent misuse practices, Everi intended to raise, and did succeed in raising, substantial barriers to entry for any potential competitor in the Relevant U.S. Market.  In furtherance of its objective to maintain significant and durable market power in the Relevant U.S. Market, Everi took advantage of the fact that significant legal costs are required to defend against aggressive patent litigation, regardless of the merits of a

17

case, and that such costs can drive a defendant out of the market or commercially weaken a defendant resulting in weakened competition.

## FIRST CAUSE OF ACTION

### Violation of Sherman Act, § 2:  *Walker Process* Claim

41.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs 1 through 40.

42.    During prosecution of the application that became the '792 Patent, one or more people substantially involved in the preparation and/or prosecution of said patent application withheld material information from the USPTO with the intent to, and effect of, deceiving the USPTO and for the purpose, and with the effect of, obtaining a patent that would not have otherwise issued.

43.    Specifically, Defendants knew that the claimed (purported) invention of the '792 Patent was in public use, on sale, or otherwise available to the public in as early as 1996 (*i.e.*, more than one year before the filing date of the application that became the '792 Patent), or was otherwise within one or more of the categories of prior art established by 35 U.S.C. § 102.  Such systems include those identified by the Arizona Department of Gaming in its publically available letter attached hereto and as otherwise described above.  Despite being aware of the above described existence of prior art, the applicants and prosecuting attorneys associated with the application that became the '792 Patent failed to disclose said prior art to the USPTO.

44.    Robert Cuccinotta and Karim Maskatiya are the named inventors of the '792 Patent.  Messrs. Cuccinotta and Maskatiya are also the co-founders of Defendant Everi and/or its predecessors-in-interest (GCA).  Messrs. Cuccinotta and Maskatiya knew about the prior art as described above, as did Defendant Everi by virtue of said individuals acting on behalf of

Defendant Everi's predecessor.  A reasonable examiner would have been substantially likely to consider said material prior art important in deciding whether to allow the application for the '792 Patent to issue in that the '792 Patent and said material prior art both relate to accessing cash from financial institutions after withdrawal or cash advance limits have been reached.

45.     Upon information and belief, Defendant Everi and its authorized representatives knew of the above referenced prior art and knew of its materiality to the application that became the '792 Patent, and intending to deceive the PTO, failed to disclose said material prior art to the USPTO.  Defendants committed patent misuse thereby rendering the '792 Patent unenforceable by virtue of Defendant Everi, its predecessor, and their authorized representatives fraudulently concealing material prior art systems.

46.     Defendant Everi has further misused its patent rights by knowingly asserting invalid and unenforceable patent claims, and by misrepresenting the scope of those claims, against NRT and other competitors.  Everi's assertion of knowingly invalid, unenforceable, and non-infringed claims was for the purpose, and with the effect of, substantially lessening competition and attempting to create, and creating, a substantial restraint on trade, and otherwise maintaining significant and durable market power in the Relevant U.S. Market during at least May 1, 2015 through January 15, 2018.  Everi should be stripped of its exemption from the antitrust law because of its attempt to enforce its patent monopoly on a patent obtained by knowing and willful misrepresentation of the facts to the USPTO.

47.     By reason of these violations, NRT and other competitors, as well as the casino customers or potential customers in the Relevant U.S. Market, as well as the market itself, were injured in their business and property.  Plaintiffs' actual damages are in the millions but are subject to an amount to be proven at trial.  NRT is entitled to treble damages under Section 2 of

the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to compensate it and the Relevant U.S. Market for the predatory and anticompetitive conduct by Defendant Everi and its efforts to prevent the entry into or expansion therein of other market participants during the time period in question.  NRT is also entitled to the costs of prosecuting this action, including its reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Violation of Sherman Act, § 2:  Sham Litigation

48.     Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs, including 1-47.

49.     Through misuse through vexatious and frivolous litigation, Everi is likewise liable for antitrust damages for sham litigation.    Prior to its sham litigation, Defendant Everi already had a significant and durable market power in the Relevant U.S. Market.  Everi sought to increase that market power through predatory and anticompetitive acts, including but not limited to sham litigation of a fraudulently procured U.S. patent.

50.     By suing without any good faith basis and on objectively baseless theories of infringement and (in)validity, Defendant Everi sought to increase its market share of the Relevant U.S. Market at the expense of Plaintiff and by way of interfering directly with its business relationships as they pertained the Relevant U.S. Market.  Defendant was able to maintain such unlawfully obtained market power through continuous acts of vexatious and frivolous litigation, including those brought against NRT.  Such sham litigations and the subsequent departures of competitors from or reduction in market power of competitors in the Relevant U.S. Market further reduced competition and enhanced Everi's significant and durable market power in the Relevant U.S. Market.

68387213.1

51.    By reason of these continuing violations, NRT and other competitors, as well as the casino customers or potential customers in the Relevant U.S. Market, as well as the market itself, were injured in their business and property by Defendant Everi's actions.  Plaintiffs' actual damages are well into the millions but in an amount to be proven at trial.  NRT is entitled to treble damages under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to compensate it and the Relevant U.S. Market for the predatory and anticompetitive conduct by Defendant Everi and its efforts to prevent the entry into or expansion therein of other market participants during the time period in question.  NRT is also entitled to the costs of prosecuting this action, including its reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    That the aforesaid acts by Defendant Everi be determined to constitute acts of patent misuse, sham litigation, monopolization, and attempts to monopolize in violation of Section 2 of the Sherman Antitrust Act, and that each of these violations injured Plaintiffs' businesses and property, as well as competition itself in the Relevant U.S. Market;

B.    That the Court determine that Plaintiffs have been injured in their property and business in an amount to be proven at trial;

C.    That the Court award Plaintiffs their compensatory damages, enhanced/trebled as provided in the Sherman and Clayton Acts, plus such other relief as may be just and equitable.

D.    That the Court award Plaintiffs their costs, including attorneys' fees, in preparing and litigating this action;

E.    A determination that Defendants are directly liable for the acts of its own officers and attorneys as described above; and

68387213.1

F.    That the Court award Plaintiffs such other and further relief as the Court deems just, proper, and/or equitable under the circumstances of this case.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury under FED. R. CIV. P. 38(b) and the Seventh Amendment to the U.S. Constitution of all issues triable as of right by jury in this action.

Of Counsel:

Colby B. Springer
Quynh M. Chen
Hannah T. Yang
Miya Yusa
POLSINELLI LLP
3 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Telephone: (415) 248-2100
Facsimile: (415) 248-2101
cspringer@polsinelli.com
qchen@polsinelli.com
hyang@polsinelli.com
myusa@polsinelli.com


Dated:  April 30, 2019

*/s/ R. Montgomery Donaldson*
R. Montgomery Donaldson (#4367)
Christina M. Belitz (#6135)
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
rmdonaldson@polsinelli.com
cbelitz@polsinelli.com

*Counsel for Plaintiffs NRT Technology*
*Corp. and NRT Technologies, Inc.*

68387213.1