# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **NRT TECHNOLOGY CORP. and** | ) | |
| **NRT TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 19-804-MN** |
| | ) | |
| **EVERI HOLDINGS INC.,** | ) | |
| **f/k/a Global Cash Access Holdings, Inc. and** | ) | |
| **EVERI PAYMENTS INC.** | ) | **JURY TRIAL DEMANDED** |
| **f/k/a Global Cash Access, Inc.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT FOR VIOLATIONS OF
## SECTION 2 OF THE SHERMAN ANTITRUST ACT

## NATURE OF ACTION

1.      Plaintiffs NRT Technology Corp. ("NRT CA") and NRT Technologies, Inc. ("NRT US") (collectively "Plaintiffs" or "NRT") bring this civil action against Defendants Everi Holdings Inc. and Everi Payments Inc. (collectively "Defendants" or "Everi") for violations of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 1 *et seq.*).

2.      Plaintiffs' claims are based upon at least:

(a) Defendants' (including their predecessors in interest, and officers and agents of the same) wrongful, knowing, intentional, and willful enforcement of an invalid and unenforceable patent fraudulently procured from the United States Patent and Trademark Office ("USPTO") by the wrongful, knowing, intentional, and willful failure to disclose known material prior art that Defendants knew or had reason to know would cause said patent to be found invalid;

(b) Defendants' (including their predecessors in interest) frivolous and vexatious patent litigation that involved the assertion of objectively baseless claims to enforce the aforementioned patent that Defendants knew to be invalid and unenforceable, said assertions having been made with a specific intent to directly interfere with and adversely affect the business operations of competitors such as NRT, these predatory and anticompetitive acts undertaken in an attempt to unlawfully obtain, increase, and/or maintain significant and durable monopoly market power in the U.S. market for unmanned, integrated kiosks providing cash access services to casino patrons on gaming facility floors, including, but not limited to, Point of Sale ("POS") debit and credit card cash advance, and certain automatic teller machine ("ATM") transactions (the "Relevant U.S. Market") from the period inclusive of, but not necessarily limited to, at least May 1, 2015 through January 15, 2018 (the "Relevant Period"); and

(c) Defendants' other conduct undertaken with the specific intent to directly interfere with and adversely affect the business operations of competitors, including NRT, by way of predatory and anticompetitive acts in an attempt to unlawfully obtain, increase, and/or maintain significant and durable monopoly market power over the aforementioned Relevant U.S. Market during at least the Relevant Period.

## JURISDICTION AND VENUE

3.      This action arises under the antitrust and patent laws of the United States of America, including Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2), Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26), the United States Patent Act (35 U.S.C. § 102-103), and Section 1.56 of Title 37 of the Code of Federal Regulations.  This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15, 26, and 1121 and 28 U.S.C. §§ 1331, 1337, and 1338.

4.      This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. § 22; 28 U.S.C. § 1391(b), (c), and (d); the long-arm statutes of the State of Delaware; and the Due Process Clause of the United States Constitution.  Defendants regularly conduct business in this state and district, "reside" in this jurisdiction, and committed acts invoking or otherwise violating U.S. patent and antitrust laws in this state and district.  A substantial part of the events giving rise to the asserted claims occurred in this district and the impact of the aforementioned violations included a substantial lessening of competition in the Relevant U.S. Market, which encompasses this district.  Defendants inflicted substantial harm to Plaintiffs' business, revenues, and profits as a result of certain predatory and anticompetitive activities that arose within this district.  Defendants also have and maintain agents in this district. The foregoing evidences "minimum contacts" with this state and district by Defendants.

2

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2), (c)(2), and (d); and 15 U.S.C. §§ 15 and 26.  Defendants are corporations organized and existing under the laws of the State of Delaware.  Defendants are presumed to be operating in accordance with the Delaware General Corporation Law.  Defendants are each subject to personal jurisdiction in this state and district because they "reside" in this state and district.  A substantial part of the events giving rise to the asserted claims arose in this state and district.

## THE PARTIES

6.     Plaintiff NRT Technologies, Inc. is a corporation organized and existing under the laws of the State of Nevada.  Plaintiff NRT Technologies, Inc. has its principal place of business at 3525 E. Post Road, Las Vegas, Nevada 89120.  Plaintiff NRT Technologies, Inc. does business throughout the United States.

7.     Plaintiff NRT Technology Corp. is a corporation organized and existing under the laws of Canada.  Plaintiff NRT Technology Corp. has its principal place of business at 10 Compass Court, Scarborough, Ontario, Canada M1S 5R3.   In conjunction with NRT Technologies, Inc., Plaintiff NRT Technology Corp. does business throughout the United States.

8.     Plaintiffs provide cash access solutions for gaming and casino facilities.  These solutions allow patrons to quickly, easily, and securely complete numerous cash access options, including POS debit and credit card cash advance and ATM transactions.  Cash access is critical to the success of gaming facilities, including casinos.  Plaintiffs' cash access solutions connect gaming facility patrons to their respective financial institutions with industry-leading up-time made possible by reliable and efficient payment processing infrastructure and unmatched customer support.

69557464.1

9.      Defendant Everi Holdings Inc. (f/k/a Global Cash Access Holdings, Inc.) is a corporation organized and existing under the laws of the State of Delaware.  Defendant Everi Holdings Inc. has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas, Nevada 89113.  Defendant Everi Holdings Inc. does business in this judicial district and state and elsewhere throughout the United States.

10.     Defendant Everi Payments Inc. (f/k/a/ Global Cash Access, Inc.) is also a corporation organized and existing under the laws of the State of Delaware.  Defendant Everi Payments Inc. also has its principal place of business at 7250 S. Tenaya Way, Suite 100, Las Vegas, Nevada 89113.  Defendant Everi Payments Inc. does business in this judicial district and state and elsewhere throughout the United States.

11.     Defendant Everi Holdings Inc. caused its name to be changed from Global Cash Access Holdings, Inc. ("GCA Holdings") effective August 24, 2015.  Defendant Everi Payments Inc. caused its name to be changed from Global Cash Access, Inc. ("GCA") effective August 24, 2015.  Defendant Everi Holdings Inc. is a holding company.  The assets of Everi Holdings Inc. are the issued and outstanding shares of capital stock of *inter alia* Defendant Everi Payments Inc. Defendant Everi Holdings Inc. is traded on the New York Stock Exchange.  Defendant Everi Holdings Inc. makes no cognizable distinction nor does it attempt to make any cognizable distinction by and between itself and Defendant Everi Payments Inc.  Defendant Everi Holdings Inc. has referred to itself and "its consolidated subsidiaries" (including Defendant Everi Payments Inc.) as "the 'Company,' 'we,' 'us,' and 'our'," in Securities and Exchange Commission filings as recently as its Form 10-K for the fiscal year ended December 31, 2018.

12.     Plaintiffs believe that Defendants Everi Payments Inc. and Everi Holdings Inc. (including any respective predecessors in interest)—either individually and/or in concert with

one another—engaged in each and every one of the complained of predatory and anticompetitive acts set forth herein.   More specifically, Plaintiffs do not believe that either Defendant entity undertook any of said actions without the knowledge, ratification, and/or express or inherent authorization of the other.   Plaintiffs further allege that when the acts of two or more entities concur in producing a single indivisible injury, the State of Delaware recognizes that such entities are jointly and severally liable regardless of common duty, common design, or concerted action.   Plaintiffs further allege that the joint and several liability of two codefendants (such as Defendants Everi Holdings Inc. and Everi Payments Inc.) entitles a plaintiff or plaintiffs (such as NRT CA and/or NRT US) to seek recovery from either or both of such defendants.   For each and every allegation and cause of action set forth herein, Plaintiffs NRT CA and NRT US, and each of them, contend that they are entitled to seek recovery from either or both of the identified Everi Defendants and hereinafter refers to them as "Defendants," "Everi," or "Defendant Everi" with the foregoing in mind.

13.     Plaintiffs and the Relevant U.S. Market have been damaged by the actions of Defendants as set forth below.

## FACTUAL BACKGROUND

14.     Gaming facilities, including casinos, routinely offer ATM and cash access services to their patrons through gaming-specific kiosks intended for use in gaming facilities "in house" and on the gaming floor.   The gaming-specific kiosks are self-service machines that allow patrons to withdraw cash from their bank accounts, take a cash advance on their debit or credit cards, and/or purchase tickets or vouchers that can be redeemed for chips at the casino cage.   These gaming-specific kiosks allow patrons to withdraw money and continue to pay for

goods and services and otherwise engage in entertainment experiences, even after reaching the daily allowed withdrawal limit for a particular account.

15.     The gaming and casino industry is subject to pervasive regulation inclusive of state and local laws, rules, regulations, and official entities.  Such regulation aims to ensure that gaming and related services are provided honestly and free of corruptive elements.  Such regulation also seeks to protect consumers and the viability of the gaming and casino industry by maintaining public confidence, preventing cheating and fraud, and establishing and maintaining responsible accounting practices and procedures through controls over financial transactions and recordkeeping.  As a result, these specialized and multi-function gaming-specific kiosks often require regulatory approval by state and/or local gaming authorities.  These gaming-specific kiosks, which provide numerous cash access options such as cash advance and ATM transactions, integrate with casino slot-management and accounting systems utilizing certified software executing thereupon.  These gaming-specific kiosks are, therefore, not reasonably interchangeable or subject to substitution with traditional banking ATMs.  The relevant product market thus encompasses the above-described gaming-specific kiosks and excludes traditional banking ATMs.

16.     The relevant geographic market is the United States, the geographic area wherein Defendants enforced their fraudulently obtained U.S. patent number 6,081,792 (the "'792 Patent") and wherein potential buyers may rationally look for the aforementioned gaming-specific kiosks.  These gaming-specific kiosks are widely deployed in gaming facilities across the country.  In 2016, which falls within the Relevant Period and concerns Defendants' predatory and anticompetitive actions, the United States had approximately 404 land-based and 500 tribal casinos.  Many of these more than 900 casinos utilized such gaming-specific kiosks, approved by

appropriate state and local regulatory agencies, to provide cash access services to their patrons. Gaming facilities demand such multi-function self-service kiosks because they reduce labor costs, shorten the time required for patrons to obtain cash or chips to return to the gaming floor, and increase the amount of currency a patron can access in a given day.  Without such self-service kiosks, gaming facilities would need to hire additional employees to handle cash or chip access services, suffer delays in providing patrons access to cash or chips, and potentially subject its patrons to daily and often arbitrary ATM withdrawal limits.  Any decrease in the amount of currency that patrons can spend per day adversely affects the profitability and viability of gaming facilities.

17.     During at least the Relevant Period, with respect to the predatory and anticompetitive acts complained of herein, Everi possessed, maintained, and controlled significant and durable monopoly market power in the Relevant U.S. Market.  During at least the Relevant Period, with respect to the predatory and anticompetitive acts complained of herein, Everi did exercise and undertake efforts to maintain that significant and durable monopoly market power through a variety of predatory and anticompetitive acts.  It is only now—in 2019, following the expiration of the '792 Patent—that the Relevant U.S. Market is recovering from the adverse effects of Defendants' predatory and anticompetitive acts.

18.     The nascent recovery in the Relevant U.S. Market is attributable to, but is not limited to, Everi's inability to continue engaging in certain predatory and anticompetitive acts related to the '792 Patent.  A true and correct copy of the '792 Patent is attached hereto as **EXHIBIT A**.  The '792 Patent was procured through fraud and deception on the USPTO by Defendants and one or more of their predecessors in interest.  This fraud included the intentional

failure by Everi and one or more of its predecessors to disclose known material prior art to the USPTO.

19.     These predatory and anticompetitive acts further included the wrongful, knowing, intentional, and willful enforcement of the '792 Patent against participants in the Relevant U.S. Market, including, but not limited to, Plaintiffs.  These predatory and anticompetitive acts still further included the assertion of objectively baseless claims that no reasonable litigant could have expected to succeed on the merits and that were motivated with the intent to directly interfere with participants in the Relevant U.S. Market, including, but not limited to, Plaintiffs. It was only after Plaintiffs *twice* invalidated the claims of the '792 Patent in two different venues following two expensive, time consuming, and disruptive litigation proceedings that Everi ultimately ceased utilizing the '792 Patent in a manner that gave rise to predatory and anticompetitive behavior.

A.     **Defendant's Predatory Acts to Create and Maintain Significant and Durable Monopoly Market Power in the Relevant U.S. Market**

1.     **Procurement of the '792 Patent through Fraud on the USPTO**

20.     NRT believes that Everi, its predecessors in interest, and those authorized to act on their behalf knew that the purported invention claimed in the '792 Patent was in public use, on sale, or otherwise available to the public in as early as 1996 (*i.e.*, more than one year before the filing date of the application that later became the '792 Patent—January 15, 1998).  Section 102(b) of the United States Patent Act in force at the time the predecessors in interest to Everi sought said patent states that "[a] person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of application for patent in the United States."  The fact that the purported invention claimed in the '792 Patent was

in use, on sale, and otherwise available to the public would have invalidated the '792 Patent under Section 102 of the United States Patent Act. Alternatively, the purported inventions claimed in the '792 Patent would have been found obvious under Section 103 of the United States Patent Act in light of certain products and services in public use, on sale, or otherwise available to the public in the United States more than one year prior to the date of application for the '792 Patent.

21. In particular, and according to a June 3, 2009 *Notice of Intent to Deny State Certification* (the "*Notice*") available from the Arizona Department of Gaming and publically accessible from the Internet in as early as 1996, Global Cash Access (the predecessor in interest to Everi Payments Inc.) was providing "products and services allow[ing] gaming patrons to access funds at casinos" including "approximately twenty (20) Tribal casinos within the exterior boundaries of [the State of] Arizona." A true and correct copy of the *Notice* is attached hereto as EXHIBIT B. At issue in the *Notice* were certain interchange fees (*i.e.*, transaction fees) related to "'quasi-cash transactions which result in the issuance of a money order to a casino patron." These transactions involve "negotiable instruments that are directly convertible to cash, such as WTMOs." WTMOs (Wire Transfer Money Orders) are processed "when a patron uses a Visa credit card from an issuing bank at a [Global Cash Access] GCA terminal"; the transaction is "captured and . . . route[d] . . . to the patron's issuing bank through Visa" and "GCA's authorization processor." The issuing bank "either sends an approval or denial message back . . . to GCA's terminal" where, "[i]f the transaction is approved," the patron is instructed "to go to the casino cashier cage, where a money order is printed which the patron can exchange for cash to use in the casino."

22.     This system, as described in the publically available *Notice*, allowed casino patrons (in 1996) that had reached a spending limit or that had otherwise expended funds to "get cash using their credit cards" whereby a patron would "not directly receive cash as a result of a cash-advance (loan) transaction, but instead buy[s] a money order redeemable only at the casino." This publically available system and the methods implemented and made possible by the same are encompassed by at least independent claims 1 and 9 of the '792 Patent, which were sought from the United States Patent Office two years later in 1998. This system that was publically available in 1996 discloses the entirety of a system allowing for the performance of the methods recited by the aforementioned claims of the '792 Patent, which were—again— sought two years later in 1998 in direct contravention of Section 102 of the United States Patent Act. Alternatively, this publically available system evidences the obviousness of the later methodologies effectuated by such a system. Said publically available system would have therefore (and alternatively) rendered obvious the later sought after claims of the '792 Patent under Section 103 of the United States Patent Act.

23.     The named inventors of the '792 Patent—Robert P. Cucinotta and Karim Maskatiya—were both aware of this prior art system and method performed by the same. The aforementioned *Notice* stated that "Robert Cucinotta was one of GCA's founders and was involved throughout in managing the Visa interchange fee matter" described therein. The *Notice* further stated that Cucinotta "was 'absolutely knowledgeable' of credit card transaction processing," and that "[e]veryone knew" about the system and corresponding payment processing methods that gave rise to the Arizona Department of Gaming's investigation. Per the *Notice*, "[e]veryone" included both Karim Maskatiya and Robert Cucinotta. The *Notice* also stated that Mr. Maskatiya was "involved in the running of the company" and that both inventors

69557464.1

were found to "control[] GCA" during the period in question, which pertains directly to material prior art systems and methods not disclosed to the USPTO during prosecution of the '792 Patent.

24.     The publically available June 3, 2009 *Notice* from the Arizona Department of Gaming also makes clear that GCA, the predecessor to Everi Payments Inc., was processing these transactions as early as 1996.  These transactions, again, allowed patrons to obtain cash advances from financial institutions after patrons met their daily transaction or withdrawal limits. These are the same type of transactions that were alleged to infringe the independent claims of the '792 Patent in various litigations brought against Plaintiff NRT by Defendants Everi and further described below.  Despite being aware of the above-described existence of material prior art, GCA and Messrs. Maskatiya and Cucinotta—as well as the attorneys and agents who prosecuted the application that matured into the '792 Patent—failed to disclose said prior art to the USPTO.

25.     This failure was not without consequence.  A reasonable examiner would have been substantially likely to consider the prior art discussed in the Arizona Department of Gaming letter important in deciding whether to allow the application for the '792 Patent.  The '792 Patent and material prior art identified by the Arizona Department of Gaming both relate to accessing cash from financial institutions after certain withdrawal or cash advance limits have been reached.  The material prior art—that system described in the *Notice*—would have directly contributed to the invalidation of the later sought after '792 Patent under Sections 102 and/or 103 of the United States Patent Act.

26.     But for GCA's and its officers and representatives' failure to disclose this material information to the USPTO, a reasonable examiner would have been unlikely to allow the application that became the '792 Patent.  Messrs. Cuccinotta and Maskatiya, as co-founders,

authorized agents, and officers for the predecessor in interest to Everi (as well as their representatives and agents at the time) knew of the above-referenced prior art and knew of its materiality to the '792 Patent.  Upon information and belief, the foregoing individuals and entities (and each of them) intended to deceive the USPTO by failing to disclose said material prior art to the USPTO.

27.     The '792 Patent was rendered unenforceable as a result of Messrs. Cuccinotta and Maskatiya, if not others on behalf of and with the knowledge of GCA, and its officers, and agents, having intentionally and fraudulently concealed material prior art systems, such as those disclosed in the publically available Arizona Department of Gaming notice, from the USPTO during prosecution.  Said individuals (on behalf of their corresponding corporate enterprise) are believed to have done so with the intent and expectation that the '792 Patent would issue but for disclosure of the material prior art.  The issuance of the '792 Patent and its subsequent enforcement and threatened enforcement against third parties in the Relevant U.S. Market, including but not limited to NRT, deterred or otherwise interfered with entry into or expansion in the Relevant U.S. Market.  Such deterrence further gave rise to and otherwise expanded Everi's (and its predecessor's) significant and durable monopoly market power during at least the Relevant Period.

## 2.     Sham Litigation Asserting Fraudulently Acquired '792 Patent

28.     In addition to having knowingly and fraudulently acquired the '792 Patent, Defendants later committed patent misuse by asserting the '792 Patent against NRT.  Defendants made such assertion with full knowledge that the '792 Patent was deceptively and fraudulently acquired.  Defendants also did so knowing full well that the assertions raised in its fraudulently acquired patent were objectively baseless and had no basis of success either as a matter of

infringement and/or (in)validity. Everi made these assertions with an aim to acquire or otherwise maintain significant and durable monopoly market power in the Relevant U.S. Market as well as to interfere directly with the business relationships of Plaintiff NRT and other competitors attempting entry into the Relevant U.S. Market or to otherwise expand in the same.

29.    Specifically, on May 1, 2015, Everi filed a complaint in the United States District Court for the District of Nevada accusing NRT of infringement of the '792 Patent. *See Global Cash Access, Inc. v. NRT Technology Corp.*, C.A. No. 2:15-cv-00822 (D. Nev.). A true and correct copy of the initiating complaint in the district court action is attached hereto as **EXHIBIT C**. Shortly thereafter, on May 4, 2015—with the Nevada action already pending— Everi commenced another action, this time with the United States International Trade Commission ("ITC"), accusing NRT of infringement of the same '792 Patent. *See In re Certain Automated Teller Machines & Point of Sale Devices & Associated Software Thereof* (Inv. No. 337-TA-958). A true and correct copy of the initiating complaint in the ITC action is attached hereto as **EXHIBIT D**. The ITC Action was substantively similar and all but identical to the allegations raised in the May 1, 2015 action filed in the District of Nevada.

30.    Both actions asserted the intentionally and fraudulently acquired '792 Patent against both NRT CA and NRT US for the purposes of acquiring or otherwise maintaining significant and durable monopoly market power in the Relevant U.S. Market, as well as interfering with the business relationships of Plaintiffs and other parties in the Relevant U.S. Market. A favorable verdict for the Everi Defendants in the Nevada action related to the intentionally and fraudulently acquired '792 Patent would have found NRT liable for (at the very least) monetary damages. A favorable verdict for the Everi Defendants in the ITC proceeding

related to the intentionally and fraudulently acquired '792 Patent would have barred the importation of certain integrated kiosk equipment sold by NRT into the United States.

31.     The '792 Patent is directed to a system and method for withdrawing money from a financial institution after the daily withdrawal limit set by that financial institution has been reached.  GCA, Everi's predecessor in interest, was already processing the same or substantially equivalent transactions in 1996.  These transactions were being processed (*i.e.*, were publically in use) more than one year before the filing date of the application for the '792 Patent.  The named inventors of the '792 Patent are the co-founders of GCA, and were officers and agents for the same.  Everi—by way of GCA—therefore knew about these prior art systems processing the later claimed accused transactions.

32.     GCA's concealment of these material prior art systems caused the USPTO to fail to consider said material prior art during prosecution of the application that became the '792 Patent.  But for GCA's concealment, the USPTO would have concluded that the '792 Patent was anticipated or at least rendered obvious by the material prior art.  Disclosure of the material prior art systems discussed by the Arizona Department of Gaming during prosecution of the application that became the '792 Patent would have, therefore, necessarily prevented the '792 Patent from being issued.  NRT is informed and believes, and thereon alleges, that said acts were undertaken by Everi, its predecessors in interest, and/or those authorized to act on its behalf with the intent and expectation that the '792 Patent would deter entry into the cash access and cash handling market in the United States, specifically providing certain automatic teller machine (ATM) and/or cash access services to casino patrons on the casino and/or gaming facility floor, including, but not limited to, cash advance, POS debit, credit card, and ATM transactions.  Such deterrence effectively and impermissibly created or otherwise extended significant and durable

monopoly market power in the Relevant U.S. Market and held by Everi during at least the Relevant Period.

33.     On March 22, 2016, the ITC determined that the asserted claims of the '792 Patent were invalid as indefinite pursuant to 35 U.S.C. § 112.  A true and correct copy of this determination is attached hereto as **EXHIBIT E**.  The ITC not only found that there was "no genuine issue as to any material fact" in arriving at said finding of indefiniteness, but also stated that arguments to the contrary and proffered by Everi were "not credible."  A true and correct copy of the *Notice of Commission* decision addressing the lack of credibility in Everi's arguments is attached hereto as **EXHIBIT F**.  On June 1, 2016, Everi filed an unopposed motion to terminate the ITC investigation in its entirety by withdrawal of the complaint in accordance with 19 C.F.R. § 210.21(a)(1).  On June 2, 2016, the ITC granted the motion terminating the investigation.  A true and correct copy of that decision addressing Everi's voluntary withdrawal of its complaint is attached here as **EXHIBIT G**.

34.     Shortly after invalidation of the '792 Patent by the ITC, the United States District Court for the District of Nevada similarly found the '792 Patent to be invalid.  In the Nevada matter, the United States District Court found (on March 25, 2016), that the '792 Patent lacked statutory subject matter and was invalid under Section 101 of the Patent Act.  A true and correct copy of the order invalidating the '792 Patent is attached hereto as **EXHIBIT H**.  Like the ITC proceeding, there was no appeal, as Defendants could not legitimately contest the findings of the respective tribunals.  Defendants' sham litigations involving the intentionally and fraudulently acquired '792 Patent should have effectively been brought to an end.

35.     In bringing both the Nevada District Court and ITC actions, Everi accused NRT of infringing the '792 Patent and engaging in otherwise undefined acts of "unfair competition."

Everi was repeatedly warned that its case was weak and lacked merit.  On July 20, 2015—little more than two months after Everi's litigation campaign commenced—NRT clearly and unambiguously advised Everi that the '792 Patent was (1) not infringed, (2) subject to invalidation by ample prior art (an example of which was attached to said correspondence), and (3) an example of an "abstract financial business method patent[]" deemed unpatentable in light of the Supreme Court's holding in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014). A true and correct copy of this correspondence is attached hereto as **EXHIBIT I**.  Everi was also advised:

> The facts and governing law here confirm by a preponderance of the evidence that [Everi] has an exceptionally weak patent and may be using it in bad faith, hoping to unfairly prevent U.S. customers from using NRT's products and services.
>
> NRT invites [Everi] to consider withdrawing its meritless claims before attorneys' fees are assessed against it or its attorneys.  In particular, we request that you discuss the foregoing with [Everi] and its owners to determine whether this matter may be resolved before further judicial, ITC, and client resources are expended.

But Everi carried on with its objectively baseless cases despite the fact that Everi knew or should have known that it lacked a good-faith basis to bring a federal patent claim in the District of Nevada as well as before the ITC.  Such knowledge made any suggestion that Everi possessed a meritorious patent claim impossible.  Everi simply elected to use the district court and the ITC as a tool for extortion-like tactics to further its own commercial motives and to otherwise maintain or further establish significant and durable monopoly market power in the Relevant U.S. Market or to otherwise directly interfere with the business relationships of participants in the Relevant U.S. Market, including and especially NRT.

36.     Although the issue of unenforceability and fraud on the USPTO were not litigated to a final determination by NRT in a district court, Everi's efforts to enforce a clearly invalid and

unenforceable patent against NRT for the intended purpose of driving NRT out of the Relevant U.S. Market amounts to sham litigation brought in bad faith to achieve its otherwise predatory and anticompetitive objectives during at least the Relevant Period.  The above-referenced frivolous litigations commenced by Everi against NRT were not isolated incidents.  Everi and its predecessors in interest have sued to enforce the intentionally and fraudulently acquired '792 Patent against many other participants in the Relevant U.S. Market.

37.     USA Payments, a predecessor in interest of Everi with respect to the '792 Patent, filed a complaint in the United States District Court for the Northern District of California accusing Hotel Ramada of Nevada of infringement of the '792 Patent.  *See USA Payments, Inc. v. Hotel Ramada of Nevada*, C.A. No. 3:01-cv-01450 (N.D. Cal.).

38.     Everi's predecessor in interest, GCA in conjunction with USA Payments, filed a complaint in the United States District Court for the District of Nevada accusing U.S. Bancorp, Certegy, Inc., Certegy Check Services, Inc., Game Financial Corporation, and Game cash, Inc. of infringement of the '792 Patent.  *See USA Payments v. U.S. Bancorp*, C.A. No. 2:04-cv-01470 (D. Nev.).

39.     In response to such frivolous litigation initiated by Everi and its predecessors in interest, participants in the Relevant U.S. Market have gone so far as to preemptively file suit to stop Everi's vexatious conduct.  For example, Sightline Payments, LLC filed a complaint in the United States District Court for the District of Nevada accusing GCA Holdings and GCA of abuse of the '792 Patent and of monopolistic acts in violation of Section 2 of the Sherman Act. *See Sightline Payments, LLC v. Global Cash Access Holdings, Inc.*, C.A. No. 2:10-cv-00397 (D. Nev.).  A true and correct copy of the initiating complaint in the district court action is attached hereto as **EXHIBIT J**.

17

40.     Automated Systems America, Inc. ("ASAI") also filed a complaint against GCA Holdings and GCA in the United States District Court for the Central District of California seeking declaratory judgment of invalidity, unenforceability, and non-infringement of the '792 Patent.  In this action—A*utomated Sys. Am., Inc. v. Global Cash Advance Holdings, Inc.*, C.A. No. 2:10-cv-04973 (C.D. Cal.)—ASAI also alleged violation of the Sherman Act.  A true and correct copy of the initiating complaint in the district court action is attached hereto as **EXHIBIT K**.

41.     But Everi's frivolous and sham litigation campaigns continued unabated throughout the years, especially against NRT.  Most recently, on October 1, 2018, Everi filed a lawsuit against NRT, Ms. Hina Reed (NRT's employee and a former employee of GCA), and Ms. Reed's husband, in Clark County, Nevada state court.  *See Everi Payments, Inc. v. NRT Tech. Corp., Neena M. Reed & John Doe Reed, husband and wife*, C.A. No. A-18-782025-C (Eighth Judicial District Court, Clark County, Nevada).  Everi sought injunctive relief and damages to preclude Ms. Reed from lawful and gainful employment with NRT by way of enforcement of an invalid and unenforceable restrictive covenant.

42.     The attempted enforcement of this invalid and unenforceable covenant was but another example of Everi's continued and longtime strategy of vexatious and frivolous litigation to achieve its predatory and anticompetitive objectives against any number of existing or potential competitors.  These litigations seek to exhaust competitor resources on costly litigation such that they would be forced to settle the litigation to their detriment and Everi's benefit in the Relevant U.S. Market thereby maintaining or further establishing significant and durable market power in the Relevant U.S. Market on behalf of Everi and its predecessors.

69557464.1

43.     For example, even after the ITC and United States District Court for Nevada found the '792 Patent invalid, Everi still did not end its litigation campaign against NRT.  Everi's efforts carried on with respect to a spurious unfair competition claim against NRT related to what can only be characterized as "defamation" of the invalidated '792 Patent.  On April 15, 2016 NRT wrote a further letter to Everi asking the plaintiff to terminate the unfair competition claim, specifically the remaining tort claims.  A true and correct copy of this correspondence is attached hereto as **EXHIBIT L.**  In that letter, NRT made clear that Everi "knew or should have known that it lacked a good faith basis to bring a federal patent claim in the United States District Court, District of Nevada."

44.     Despite multiple defeats and multiple warnings, Everi continued to assert an objectively baseless case.  It was only on October 19, 2017, when NRT noticed the depositions of nine then-Everi employees coupled with a third-party subpoena to its former CEO—the same CEO that authorized commencement of certain of the sham litigations against NRT—that Everi realized even it could no longer sustain this objectively baseless action.  Everi voluntarily stipulated to dismiss the action a week later on October 24, 2017.

45.     Everi's claims of infringement and unfair competition against NRT rang as hollow on May 1, 2015 as they did on October 24, 2017.  The Nevada action—like those before it—were continuations of Everi's longtime strategy of vexatious and frivolous litigation against existing or potential competitors in an effort to maintain or further establish Everi's and its predecessors' significant and durable monopoly market power in the Relevant U.S. Market.  These actions should simply never have been brought.  Everi was presented with numerous opportunities to dismiss said actions in light of ample evidence to its detriment.  But Everi instead continued its fight and incurred significant expense to NRT.

46.     Notwithstanding NRT's complete and total victory over Everi, NRT is informed and believes and thereon alleges that certain representatives of Everi continue to make representations that the twice-invalidated and since-expired '792 Patent remains enforceable and/or that NRT is otherwise unable to perform certain transactions that Everi contended to be covered by said invalidated patent.  This behavior should not be allowed or encouraged in the future.  A proper deterrent requires the imposition of treble damages against Everi for its efforts to maintain or further establish significant and durable monopoly market power in the Relevant U.S. Market during at least the Relevant Period.

47.     NRT is informed and believes and thereon alleges that by virtue of the predatory and anticompetitive conduct discussed above, Defendant Everi was able to maintain significant and durable monopoly market power in the Relevant U.S. Market during at least the Relevant Period.  For example, at points during the Relevant Period, Everi's market share for financial services related to the Relevant U.S. Market was estimated to be between 70% and 75%.  It is only today, following the invalidation and expiration of the intentionally and fraudulently acquired and oft asserted '792 Patent, that Everi's estimated market share has begun to decrease.

48.     This change in the market evidences the fact that the '792 Patent and the vexatious and illicit enforcement of the same was a part of Everi's ability to procure and maintain its significant and durable monopoly market power in the Relevant U.S. Market during at least the Relevant Period.  This also evidences Everi's procurement and maintenance of its significant and durable monopoly market power did not occur by virtue of superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions.  Instead, said procurement and maintenance of monopoly market power occurred as the result of Everi's purposeful abuse of the patent system and the judicial process.

As a result of Defendants' actions, potential competitors could not enter the Relevant U.S. Market or naturally expand within the same without a multi-million dollar war chest and a business plan that includes millions in upfront litigation costs as part of its anticipated start-up or growth expense.

49.     Through its predatory patent litigation and patent misuse practices, Everi intended to raise, and did succeed in raising, substantial barriers to entry for any potential competitor in the Relevant U.S. Market.   In furtherance of its objective to maintain significant and durable monopoly market power in the Relevant U.S. Market, Everi took advantage of the fact that significant legal costs are required to defend against aggressive patent litigation, regardless of the merits of a case, and that such costs can drive a defendant out of the market or commercially weaken a defendant resulting in weakened competition.

## FIRST CAUSE OF ACTION

### Violation of Sherman Act, § 2: *Walker Process* Claim

50.     Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs 1 through 49.

51.     During prosecution of the application that became the '792 Patent, one or more people substantially involved in the preparation and/or prosecution of said patent application withheld material information from the USPTO with the intent to, and effect of, deceiving the USPTO and for the purpose, and with the effect of, obtaining a patent that would not have otherwise issued.

52.     Specifically, Defendants knew that the claimed (purported) invention of the '792 Patent was in public use, on sale, or otherwise available to the public by at least 1996 (*i.e.*, more than one year before the filing date of the application that became the '792 Patent), or was

otherwise within one or more of the categories of prior art established by Section 102 of the United States Patent Act.  Such systems include those identified by the Arizona Department of Gaming in its publically available notice described above.  Despite being aware of the above-described existence of material prior art, the applicants and prosecuting attorneys associated with the application that became the '792 Patent failed to disclose said material prior art to the USPTO.

53.     Robert Cuccinotta and Karim Maskatiya are the named inventors of the '792 Patent.  Messrs. Cuccinotta and Maskatiya are also the co-founders of Defendant Everi and/or its predecessors-in-interest (GCA).  Messrs. Cuccinotta and Maskatiya knew about the material prior art as described above, as did Defendant Everi by virtue of said individuals acting on behalf of Defendant Everi's predecessor.  A reasonable examiner would have been substantially likely to consider said material prior art important in deciding whether to allow the application for the '792 Patent to issue.  The '792 Patent and said material prior art both relate to accessing cash from financial institutions after withdrawal or cash advance limits have been reached.

54.     Upon information and belief, Defendant Everi and its authorized representatives knew of the above-referenced prior art.  Upon information and belief, Defendant Everi and its authorized representatives knew of the materiality of said art to the application that became the '792 Patent.  Upon information and belief, Defendant Everi and its authorized representatives, intending to deceive the PTO, failed to disclose said material prior art to the USPTO. Defendants' later assertion of this intentionally and fraudulently acquired patent constituted patent misuse thereby rendering the '792 Patent unenforceable by virtue of Defendant Everi, its predecessor, and their authorized representatives fraudulently concealing material prior art systems.

55.     Defendant Everi has further misused its patent rights by knowingly asserting invalid and unenforceable patent claims, and by misrepresenting the scope of those claims, against NRT and other competitors.  Everi's assertion of knowingly invalid, unenforceable, and non-infringed claims was for the purpose, and with the effect of, substantially lessening competition and attempting to create, and creating, a substantial restraint on trade, and otherwise maintaining significant and durable monopoly market power in the Relevant U.S. Market during at least the Relevant Period.  Everi should be stripped of any exemption from the antitrust law because of its attempt to enforce its patent monopoly on a patent obtained by knowing and willful misrepresentation of the facts to the USPTO.

56.     By reason of these violations, NRT and other competitors, as well as the casino customers or potential customers in the Relevant U.S. Market, as well as the market itself, were injured in their business and property.  Plaintiffs' actual damages are in the millions of dollars but are subject to an amount to be proven at trial.  NRT is entitled to treble damages under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to compensate it and the Relevant U.S. Market for the predatory and anticompetitive conduct by Defendant Everi and its efforts to prevent the entry into or expansion therein of other market participants during the period in question.  NRT is also entitled to the costs of prosecuting this action, including its reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Violation of Sherman Act, § 2:  Sham Litigation

57.     Plaintiffs repeat and incorporate by reference the set forth in each of the preceding paragraphs 1 through 56.

58. Through misuse through vexatious and frivolous litigation, Everi is likewise liable for antitrust damages for sham litigation. Prior to its sham litigation, Defendant Everi already had a significant and durable monopoly market power in the Relevant U.S. Market. Everi sought to increase that market power through predatory and anticompetitive acts, including, but not limited to, sham litigation of a fraudulently procured U.S. patent.

59. By initiating litigation and the ITC action without any good-faith basis and on objectively baseless theories of infringement and (in)validity, Defendant Everi sought to increase its market share of the Relevant U.S. Market at Plaintiffs' expense and by way of interfering directly with Plaintiffs' business relationships as they pertained to the Relevant U.S. Market. Defendant was able to maintain such unlawfully obtained market power through continuous acts of vexatious and frivolous litigation, including those brought against NRT. Such sham litigation and the subsequent departures of competitors from or reduction in market power of competitors in the Relevant U.S. Market further reduced competition and enhanced Everi's significant and durable monopoly market power in the Relevant U.S. Market.

60. By reason of these continuing violations, NRT and Defendants' other competitors, as well as the casino patrons or potential customers in the Relevant U.S. Market, as well as the market itself, were injured in their business and property by Defendant Everi's actions. Plaintiffs' actual damages are well into the millions but in an amount to be proven at trial. NRT is entitled to treble damages under Section 2 of the Sherman Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to compensate it and the Relevant U.S. Market for the predatory and anticompetitive conduct by Defendant Everi, and its efforts to prevent competitors from entering or expanding their presence in the market during at least the

Relevant Period.   NRT is also entitled to the costs of prosecuting this action, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    That the aforesaid acts by Defendant Everi be determined to constitute acts of patent misuse, sham litigation, monopolization, and attempts to monopolize in violation of Section 2 of the Sherman Antitrust Act, and that each of these violations injured Plaintiffs' businesses and property, as well as competition itself in the Relevant U.S. Market;

B.    That the Court determine that Plaintiffs have been injured in their property and business in an amount to be proven at trial;

C.    That the Court award Plaintiffs their compensatory damages, enhanced/trebled as provided in the Sherman and Clayton Acts, plus such other relief as may be just and equitable;

D.    That the Court award Plaintiffs their costs, including attorneys' fees, in preparing and litigating this action;

E.    A determination that Defendants are directly liable for the acts of its own officers and attorneys as described above; and

F.    That the Court award Plaintiffs such other and further relief as the Court deems just, proper, and/or equitable under the circumstances of this case.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury under FED. R. CIV. P. 38(b) and the Seventh Amendment to the United States Constitution of all issues triable as of right by jury in this action.

*/s/ R. Montgomery Donaldson*
R. Montgomery Donaldson (#4367)
Christina B. Vavala (#6135)

Of Counsel:

POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
rmdonaldson@polsinelli.com
cvavala@polsinelli.com

Colby B. Springer
Quynh M. Chen
Miya Yusa
POLSINELLI LLP
3 Embarcadero Center, Suite 2400
San Francisco, CA 94111
Telephone: (415) 248-2100
Facsimile: (415) 248-2101
cspringer@polsinelli.com
qchen@polsinelli.com
myusa@polsinelli.com

*Counsel for Plaintiffs NRT Technology
Corp. and NRT Technologies, Inc.*

Dated:  July 15, 2019