**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NRT TECHNOLOGY CORP. and<br>NRT TECHNOLOGIES, INC.,<br><br>   Plaintiffs,<br><br> v.<br><br>EVERI HOLDINGS INC. and<br>EVERI PAYMENTS INC.,<br><br>   Defendants. | Civil Action No. 19-804-MN-SRF |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Presently before the court in this civil action alleging violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, is the motion of defendants Everi Holdings Inc. and Everi Payments Inc. (together, "Defendants") to disqualify Colby Springer, Polsinelli PC, and Polsinelli LLP as counsel for plaintiffs NRT Technology Corp. and NRT Technologies, Inc. (together, "Plaintiffs" or "NRT").[1] (D.I. 57)  For the following reasons, Defendants' motion to disqualify Plaintiffs' counsel is DENIED.

## II. BACKGROUND

### A. Procedural History

Plaintiffs filed this action against Defendants on April 30, 2019, alleging violations of Section 2 of the Sherman Act. (D.I. 1)  Before a responsive pleading was filed, Plaintiffs filed an amended complaint on July 15, 2019. (D.I. 7; D.I. 18, Ex. B)  The amended complaint includes *Walker Process* and sham litigation antitrust claims relating to prior patent litigation

---

[1] The briefing and other filings related to the present motions are found at D.I. 58, D.I. 59, D.I. 60, D.I. 65, D.I. 66, D.I. 67, D.I. 68, and D.I. 71.

between the parties.  (D.I. 7 at ¶¶ 50-60)  The *Walker Process* claim alleges that Defendants violated the Sherman Act by asserting United States Patent No. 6,081,792 ("the '792 patent")[2] despite knowing that it was acquired through fraud.  (*Id.* at ¶¶ 50-56)  The sham litigation claim alleges that Defendants violated the Sherman Act by instituting sham litigation against Plaintiffs and others.  (*Id.* at ¶¶ 57-60)  Both counts are premised on Plaintiffs' contention that Defendants knew the '792 patent was invalid due to the prior public use of a kiosk that practiced the claimed method by Global Cash Access, Inc. ("GCA").  (*Id.* at ¶¶ 20-49)

On September 17, 2019, Defendants filed a motion to dismiss the first amended complaint for insufficiency of service of process and failure to state a claim.  (D.I. 12)  The following month, Plaintiffs responded to the motion to dismiss and also filed a motion for leave to file an amended pleading.  (D.I. 18; D.I. 19)  Defendants' motion to dismiss was denied, and Plaintiffs' motion to amend was denied as moot.  (D.I. 34; D.I. 45; D.I. 46)  Defendants filed an answer to the first amended complaint on October 23, 2020.  (D.I. 55)  The following month, Defendants filed the instant motion to disqualify counsel, alleging that lead counsel Colby Springer should not be permitted to represent Plaintiffs in this case because Mr. Springer's former law firm previously represented GCA, the predecessor of defendant Everi Payments Inc. ("Everi"), in responding to two state department of gaming investigations.[3]  (D.I. 57; D.I. 58 at 1-3)

---

[2] The '792 patent generally describes and claims methods of providing money to an account holder at a terminal.  Defendant Everi Payments Inc. is the current assignee of the '792 patent.
[3] At the time of the previous representation, defendant Everi Payments Inc. ("Everi") was known as Global Cash Access, Inc. ("GCA"), and defendant Everi Holdings Inc. was known as Global Cash Access Holdings, Inc.  (D.I. 7 at ¶¶ 9-10)  Both predecessor entities caused their names to be changed effective August 24, 2015.  (*Id.* at ¶ 11)  The named inventors of the '792 patent are Robert Cucinotta and Karim Maskatiya.  ('792 patent; D.I. 7 at ¶ 23)

The motion to disqualify counsel was referred to the undersigned judicial officer for resolution on December 4, 2020. (D.I. 62) The motion was fully briefed on January 13, 2021. (D.I. 71) The court heard oral argument on the motion on February 25, 2021.

**B. History of the Parties' Legal Representation**

    **1. State gaming investigations**

Mr. Springer's former law firm, Lewis Roca Rothgerber LLP ("LRR"), represented GCA from 2008 until at least November 2011 in state regulatory matters, including an issue before New Mexico's gaming authority and an investigation by the Arizona Department of Gaming ("ADOG") into GCA and its founders, Robert Cucinotta, and Karim Maskatiya.[4] (D.I. 59 at ¶ 3; Ex. 1 at ¶ 2; D.I. 60, Ex. 1 at 5 n.5, 10 n.11; D.I. 7 at ¶ 23) The ADOG investigation examined whether GCA had deliberately underpaid interchange fees to banks in the Visa network for Wire Transfer Money Order ("WTMO") transactions between 1999 and 2002. (D.I. 60, Ex. 1 at 2-4, 33-34) On June 3, 2009, the ADOG sent a letter to GCA (the "2009 letter") indicating its intent to deny renewal of GCA's state certification to provide gaming services based on the results of its investigation, which concluded that the fraudulent underpayments amounted to the theft of $26 million which GCA concealed until coming under investigation. (*Id.* at 3, 33) On November 17, 2009, the ADOG and GCA reached a settlement agreement, pursuant to which GCA's state certification was renewed in exchange for payment of fines, changes to GCA's ownership and personnel, and implementation of updated policies and controls, among other conditions. (D.I. 66, Ex. A)

---

[4] There is no dispute that LRR did not represent Mr. Cucinotta and Mr. Maskatiya in the prosecution of the patent application leading to the issuance of the '792 patent. The face of the '792 patent identifies Mr. Cucinotta and Mr. Maskatiya as inventors of the '792 patent, and it identifies Townsend and Townsend and Crew LLP as counsel in the prosecution of the patent application.

LRR exchanged confidential and privileged communications with GCA and had access to GCA's confidential information over the course of the legal representation. (D.I. 59 at ¶¶ 4-5; Ex. 1 at ¶¶ 3-5) The record indicates that GCA paid LRR over $600,000 in legal fees between 2008 and 2011. (D.I. 59 at ¶ 6; Ex. 1 at ¶ 7) Mr. Springer joined LRR's intellectual property practice in Menlo Park, California in May 2011. (D.I. 59 at ¶¶ 3, 7; D.I. 68 at ¶ 3) Mr. Springer is not barred in Arizona, and his work at LRR did not involve state gaming regulations. (D.I. 68 at ¶ 5)

### 2. Patent infringement actions

On May 1, 2015, GCA sued NRT in the United States District Court for the District of Nevada, alleging causes of action for infringement of the '792 patent, unfair competition, intentional interference with prospective economic advantage, and deceptive trade practices (the "Nevada Action"). (D.I. 7 at ¶ 29; Ex. C) Mr. Springer was one of a team of attorneys from LRR representing NRT in the Nevada Action. (D.I. 59 at ¶ 7) On March 25, 2016, the district court determined that the '792 patent was invalid under 35 U.S.C. § 101, and the parties subsequently stipulated to dismissal of the remaining claims in October 2017. (D.I. 7 at ¶¶ 34, 44; Ex. H)

Three days after filing the Nevada Action, on May 4, 2015, GCA filed a complaint with the United States International Trade Commission ("ITC") alleging that NRT's gaming-specific kiosks infringed the '792 patent (the "ITC Action"). (D.I. 7 at ¶ 29; Ex. D) Mr. Springer and LRR also represented NRT in the ITC Action. (D.I. 59 at ¶ 7) NRT asserted several affirmative defenses to GCA's infringement allegations, including a prior use defense based on the 2009 letter from the ADOG. (D.I. 60, Ex. 2 at 15-16) Specifically, NRT alleged that the 2009 letter showed GCA "was processing transactions no later than 1996 that permitted casino patrons to

4

obtain cash advances from financial institutions after the patrons had met their daily cash-advance limit." (*Id.* at 16)  NRT also alleged that GCA procured the '792 patent by fraud because Mr. Cucinotta and Mr. Maskatiya, the named inventors, were aware of relevant prior art but failed to disclose it at the time they submitted the application for the '792 patent, rendering the '792 patent unenforceable due to inequitable conduct. (*Id.* at 18)  Similarly, NRT's patent misuse defense alleged that Mr. Cucinotta and Mr. Maskatiya concealed material prior art systems to procure the '792 patent, with the intent of asserting the fraudulently acquired patent and deterring entry by others into the cash access and cash handling market. (*Id.* at 19)  In connection with these defenses, NRT indicated its intention to submit evidence regarding licensing refusals from state licensing and gaming agencies involving technologies covered by the '792 patent. (D.I. 60, Ex. 3 at Ex. A at 5)

During the discovery process in the Nevada and ITC Actions, GCA became aware of LRR's prior representation of GCA in the ADOG investigation and demanded LRR's immediate withdrawal from both actions. (D.I. 60, Ex. 4 at Ex. B)  Mr. Springer responded on behalf of LRR, declining to withdraw from the representations of NRT based on the position that the Nevada and ITC Actions were not sufficiently related to the ADOG investigation to give rise to a conflict of interest. (*Id.*, Ex. 4 at Ex. C)  GCA then moved to disqualify LRR as NRT's counsel due to LRR's previous representation of GCA in the ADOG investigation. (D.I. 60, Ex. 5; D.I. 59 at ¶ 8)  Thereafter, the parties stipulated that NRT would withdraw its invalidity and unenforceability defenses based on GCA's alleged prior public use. (D.I. 60, Ex. 4 at Exs. F-K; Ex. 6)

In January 2016, while the Nevada and ITC Actions remained pending, Mr. Springer left LRR and joined Polsinelli LLP. (D.I. 68 at ¶¶ 18, 21)  Mr. Springer continued to represent NRT

5

in the Nevada Action and the ITC Action. (*Id.*) On March 22, 2016, the ITC invalidated the independent claims of the '792 patent as indefinite under 35 U.S.C. § 112, and that finding was affirmed. (D.I. 7 at ¶ 33; Exs. E-F) The ITC Action was terminated in June 2016 after Everi filed an unopposed motion to withdraw the complaint. (*Id.* at ¶ 33; Ex. G)

### III. LEGAL STANDARD

The Court has the inherent authority to supervise the professional conduct of attorneys appearing before it, including the power to disqualify an attorney from a representation. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). Attorney conduct is governed by the ethical standards of the court before which the attorney appears. *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984); *Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 686 (D. Del. 2016). The United States District Court for the District of Delaware has adopted the Model Rules of Professional Conduct of the American Bar Association. *See Regalo*, 211 F. Supp. 3d at 686; D. Del. LR 83.6(d).

At issue in the present case are Model Rules of Professional Conduct 1.9 and 1.10. (D.I. 58 at 8-20) Rule 1.9(a) describes a lawyer's duty to avoid representations that conflict with the interests of former clients:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Model Rules of Prof'l Conduct ("M.R.P.C.") r. 1.9(a) (Am. Bar Ass'n 2019). Rule 1.9(b) extends the obligations imposed by Rule 1.9(a) to lawyers who have changed firms:

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) whose interests are materially adverse to that person; and (2) about whom the lawyer had acquired information protected by

6

>Rules 1.6 and 1.9(c) that is material to the matter, unless the former client gives informed consent, confirmed in writing.

M.R.P.C. r. 1.9(b). To establish that a lawyer's representation violates Rule 1.9, the moving party must show that: "(1) the lawyer had an attorney-client relationship with the former client; (2) the present client's matter is the same or 'substantially related' to the matter the lawyer worked on for the former client; (3) the interests of the second client are materially adverse to the interests of the former client; and (4) the former client did not consent to the representation after consultation." *Regalo*, 211 F.3d at 686-87 (quoting *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, C.A. No. 10-1067-LPS, 2011 WL 2692968, at *5 (D. Del. June 22, 2011); *Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 660 F. Supp. 2d 557, 561 (D. Del. 2009)).

Pursuant to Rule 1.10, an individual attorney's conflicts of interest are generally imputed to all of the other attorneys practicing at the same firm. *See* M.R.P.C. r. 1.10(a). Even after an attorney leaves a firm, the firm may not represent a person with interests materially adverse to those of a client represented by the previously-associated attorney if the matter is "the same or substantially related to that in which the formerly associated lawyer represented the client" and "any lawyer remaining in that firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter." M.R.P.C. r. 1.10(b). In this regard, Rule 1.10 "incorporates the rules for disqualification for an individual attorney as spelled out in Rule 1.9 and applies them to [an] entire firm[.]" *Nemours Foundation v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 425 (D. Del. 1986).

The Third Circuit has described Rule 1.9 as a "prophylactic rule" to prevent "even the potential that a former client's confidences and secrets may be used against him[,]" to maintain "public confidence in the integrity of the bar[,]" and to fulfill a client's rightful expectation of "the loyalty of his attorney in the matter for which he is retained." *Corn Derivatives*, 748 F.2d at

7

162. Any doubts about whether disqualification is appropriate should be resolved in favor of the moving party to ensure protection of client confidences. *See INA Underwriters v. Nalibotsky*, 594 F. Supp. 1199, 1207 (E.D. Pa. 1984); *see also Buschmeier v. G & G Invs., Inc.*, 2007 WL 4150408, at *7 (E.D. Pa. Nov. 19, 2007). Therefore, disqualification is proper under the "substantial relationship" standard "when the similarity in the two representations is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client." *Regalo*, 211 F. Supp. 3d at 687 (quoting *Intellectual Ventures I*, 2011 WL 2692968, at *5); *see also Sonos, Inc. v. D & M Holdings Inc.*, C.A. No. 14-1330-RGA, 2015 WL 5277194, at *2 (D. Del. Sept. 9, 2015).

Nevertheless, disqualification is disfavored, and the moving party bears the burden to demonstrate that "continued representation would be impermissible." *Sonos*, 2015 WL 5277194, at *1 (quoting *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007)). "[V]ague and unsupported allegations are not sufficient to meet this standard." *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006) (quoting *Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa.1994)). To determine whether disqualification is warranted, a court must "carefully sift all the facts and circumstances" in the case, with the understanding that disqualification "is never automatic." *Regalo*, 211 F. Supp. 3d at 687 (quoting *Intellectual Ventures I*, 2011 WL 2692968, at *6); *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 n. 7 (D. Del. 2009). The Court must approach motions to disqualify counsel with "cautious scrutiny," mindful of a litigant's right to the counsel of its choice. *Intellectual Ventures I*, 2011 WL 2692968, at *6 (citing *Laker Airways, Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 27-28 (D.D.C. 1984)).

## IV. DISCUSSION

### A. The Representations Are Not Substantially Related Under Rule 1.9.

To assess whether the state gaming investigations and Mr. Springer's representations of NRT are substantially related, the court must consider: (1) the nature and scope of the prior representation, (2) the nature of the present lawsuit against the former client, and (3) the possibility that client confidences were disclosed in the prior representation which could be relevant to the present action and potentially damaging to the former client. *Madukwe v. Del. State Univ.*, 552 F. Supp. 2d 452, 458 (D. Del. 2008) (citing *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987)). "[T]he proper approach considers both the similarity of the legal issues and the factual issues." *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, C.A. No. 10-1067-LPS, 2011 WL 2692968, at *9 (D. Del. June 22, 2011). Under this framework, Mr. Springer's representation of NRT is not substantially related to LRR's representation of GCA in the ADOG investigation.

Defendants do not dispute that the legal issues in the state gaming investigations are different from those at issue in this antitrust action. (D.I. 71 at 1) The ADOG investigation addressed the fraudulent underpayment of interchange fees by GCA for cash advances between 1999 and 2002, in violation of state gaming regulations. (D.I. 60, Ex. 1 at 28-35) The investigation did not address any patents or patent applications. (*Id.*) By contrast, Plaintiffs assert federal causes of action under Section 2 of the Sherman Act in the present action, including *Walker Process* and sham litigation claims. (D.I. 7 at ¶¶ 50-60) The relevant time period in the ADOG investigation does not overlap with the present action seeking redress for sham litigation pursued by Everi between 2015 and 2018 based on alleged infringement of the

9

'792 patent, which issued from a 1998 patent application despite claiming an invention that had been in use since 1996. (D.I. 7 at ¶¶ 20-21, 28-32)

The focus of Defendants' argument instead rests on purported factual similarities that allegedly render the matters substantially related. (D.I. 71 at 1-2) Defendants emphasize the fact that the 2009 letter from the ADOG investigation forms the basis for NRT's assertion that Everi's patents are invalid and were procured by fraud, and they argue that the matters each require an in-depth understanding of the same WTMO technology. (D.I. 58 at 10-11) Defendants also allege that Mr. Cucinotta, Mr. Maskatiya, and Everi's former CEO, Kirk Sanford, likely provided confidential information to LRR during the ADOG investigation, and these same individuals were identified in NRT's Rule 16 initial disclosures. (*Id.* at 12)

In response, Plaintiffs contend that the factual issues in this matter are not substantially related to those at issue in the ADOG investigation, which did not involve the '792 patent or any other patents and which addressed WTMOs in a different context. (D.I. 65 at 14) Plaintiffs further allege that there is no overlap in the relevant time periods because the ADOG investigation addressed conduct between 1999 and 2002, whereas the instant antitrust action focuses on alleged prior use in 1996 and the filing of the application leading to issuance of the '792 patent in 1998 as a basis for sham litigation against NRT beginning in 2015. (*Id.* at 14-15) Plaintiffs note that, while the 2009 letter is relevant to this antitrust case, it is a publicly available record showing GCA's use and sale of WTMOs which does not reflect confidential advice rendered by LRR in the ADOG investigation. (*Id.* at 15, 17)

References to the WTMO technology in both the ADOG investigation and the present case, without more, are insufficient to render the matters substantially related. In the ADOG investigation, the WTMO technology was relevant to whether GCA was properly coding WTMO

10

quasi-cash transactions and paying the corresponding interchange fee. (D.I. 60, Ex. 1 at 4-5) In contrast, the amended complaint in the present action references WTMO transactions to support NRT's allegation that the cash advance terminals claimed in the '792 patent were in public use more than one year before the patent application was filed in 1998. (D.I. 7 at ¶¶ 20-21) That NRT's amended complaint in this action referenced the technical description of the WTMOs in the 2009 letter to establish that those transactions were of the same kind claimed in the '792 patent does not render the matters substantially related.

The cases relied upon by Everi suggest that more is needed than an identity of technology to render the matters substantially related. In *Innovative Memory Solutions, Inc. v. Micron Technology, Inc.*, the court granted a motion to disqualify counsel because two of the plaintiff's attorneys had previously represented the defendant in seven patent cases and a trade secret case focusing on the same NAND flash technology at issue in the patent infringement case before the court. C.A. No. 14-1480-RGA, 2015 WL 2345657, at *3 (D. Del. May 15, 2015). The court rested its conclusion not only on the identity of the NAND flash technology, but also on the identity of the legal issues, the identity of the attorneys involved and the scope of their prior representation, and the likelihood that those attorneys learned sensitive confidences about the NAND flash technology over the course of the prior representations that could be used against the former client in the current representation. *Id.* at *3-5. By contrast, there is no dispute in this case that the legal issues in the prior and present actions are not similar, and Mr. Springer was not personally involved in the representation of GCA in the state gaming matters. Moreover, the publicly available 2009 letter from the ADOG investigation describing the WTMO technology is "generally known" under Rule 1.9(c)(1).

In *Apeldyn Corp. v. Samsung Electronics Co., Ltd.*, the court similarly granted the defendant's motion to disqualify plaintiff's counsel and his law firm based on his previous representation of the defendant in patent litigation involving dynamic random access memory ("DRAM") chips while working at a different firm. 660 F. Supp. 2d 557, 559-60, 562 (D. Del. 2009). The court considered how the same attorney representing the plaintiff in the present matter had billed more than 4,000 hours on behalf of the defendant in the prior matter, including work on claim construction positions and invalidity positions. *Id.* at 559. As in *Innovative Memory Solutions*, the *Apeldyn* court did not consider the similarities in the technology at issue in isolation. Instead, the court considered them in conjunction with an assessment of the similar legal issues in the two matters and the likelihood that counsel had obtained information from the first representation that could prove useful against the former client in the subsequent representation. *Id.* at 562. Here, however, Mr. Springer did not represent GCA in the ADOG investigation, and the differences in the legal issues presented in the proceedings reduce the likelihood that LRR obtained any confidential information from GCA that could prove useful against Everi in this case. *See Regalo*, 211 F. Supp. 3d at 692 (denying motion to disqualify where counsel's prior representation did not involve patent law generally, let alone work tied to the specific patents at issue in the litigation).

The fact that Mr. Cucinotta, Mr. Maskatiya, and Mr. Sanford were relevant witnesses in both the ADOG investigation and the present litigation is likewise insufficient to show that the matters are substantially related. In the present action, NRT's initial disclosures identified Mr. Cucinotta , Mr. Maskatiya, and Mr. Sanford as individuals who may have knowledge of enforcement of the '792 patent, Everi's operations, defenses, information related to the previous patent litigation, and financial data including revenue, profits, costs, and projected sales. (D.I.

60, Ex. 7 at 5, 8) In contrast, their roles as witnesses in the ADOG investigation focused on their knowledge of the mis-coded transactions and underpayment of interchange fees, as opposed to the '792 patent. (*Id.*, Ex. 1 at 6 n.6, 7 n.8, 9-12, 21-26) Because Mr. Springer did not join LRR until two years after the conclusion of the ADOG investigation in 2009, Mr. Springer did not personally interact with any GCA witnesses during LRR's representation of GCA in the ADOG investigation. (D.I. 66, Ex. A; D.I. 68 at ¶¶ 3, 14-16) Accordingly, it is not plausible to suggest that Mr. Springer obtained confidential information from these overlapping witnesses as a result of LRR's representation of GCA in the ADOG investigation. *See Madukwe*, 552 F. Supp. 2d at 461 ("[A] conclusion about the possession of [confidential] information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.").

      Based on the nature and scope of the prior and present representations, it is apparent that the risk of shared client confidences disclosed in the prior representation being used to Everi's disadvantage in the present representation is minimal. Only three lawyers from LRR represented GCA in the ADOG investigation, which ended in 2009, and Mr. Springer did not join the California office of LRR until 2011. (D.I. 66, Ex. A; D.I. 67 at ¶ 4; D.I. 68 at ¶ 3) There is no indication that LRR advised GCA regarding the '792 patent or any other patent-related matter, and LRR did not prosecute the application leading to the issuance of the '792 patent. These facts confirm that LRR's representation of GCA in the state gaming investigations was focused and narrow, unlike the prior representation considered by the court in *EON Corp. IP Holdings LLC v. Flo TV Inc.*, which spanned a period of seven years and covered a broad range of patent-related issues. C.A. No. 10-812-RGA, 2012 WL 4364244, at *4 (D. Del. Sept. 24, 2012). Even if some information obtained from the prior representation could be relevant to Mr. Springer's

13

representations of NRT, "there is a relatively low likelihood that confidential information . . . gained in the first representation [may be] used to the detriment of the former client in the subsequent action" where, as here, the prior representation "did not touch the subject matter of these cases to any great extent." *See TQ Delta, LLC v. 2Wire, Inc.*, C.A. No. 13-1835-RGA *et al.*; 2016 WL 5402180, at *6 (D. Del. Sept. 26, 2016) (declining to disqualify counsel because the confidential information, while of some relevance to the action, was not "of such pertinence that [the] continued representation . . . would unfairly harm" the movant); *see also Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 689 (D. Del. 2016) (concluding that any confidences disclosed from the prior representation were not sufficiently relevant to the present action or sufficiently detrimental to the former client to warrant disqualification).

Because Defendants have failed to show that the prior representation is the same or substantially related to the present matter, Mr. Springer cannot be disqualified under either Rule 1.9(a) or Rule 1.9(b).

### B. No Conflict Is Imputed to The Polsinelli Firm Under Rule 1.10.

Having concluded that Mr. Springer's representation of NRT in the present case is not disqualifying under Rule 1.9 for the reasons set forth at § IV.A, *supra*, there is no basis to impute a conflict of interest to the entire Polsinelli firm under Rule 1.10. *See Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 425 (D. Del. 1986) ("Rule 1.10 incorporates the rules for disqualification for an individual attorney as spelled out in Rule 1.9 and applies them to the entire firm.").

### V. CONCLUSION

For the foregoing reasons, Defendants' motion to disqualify counsel is DENIED. (D.I. 57) An Order consistent with this Memorandum Opinion shall issue.