# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NRT TECHNOLOGY CORP. and<br>NRT TECHNOLOGIES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>EVERI HOLDINGS INC. and<br>EVERI PAYMENTS INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 19-804 MN-SRF<br>)<br>)<br>)<br>)<br>) |

# EXHIBIT 2

# NRT'S STATEMENT OF CONTESTED FACTS
# TO BE LITIGATED AT TRIAL

85098689.1

**I.      Everi and Its Predecessors in Interest**

1. Global Cash Access, Inc. began as an identically named, but privately held, company founded in 1996.

2. Two years later, as part of a joint venture, Global Cash Access was used to form BMCF Gaming, LLC.

3. The formation of BMCF Gaming, LLC involved the Global Cash Access partnership, M&C International, First Data Corp., and certain operating arms of Bank of America.

4. First Data acquired portions of Comdata and its product portfolio.

5. Robert P. Cucinotta and Karim Maskatiya were the co-founders of Global Cash Access, Inc. and sat on its Board of Directors

6. Karim Maskatiya was also a co-chairman of Global Cash Access, Inc.

7. Kirk Sanford was president, chief executive officer, and director of Global Cash Access, Inc.

8. Everi Holdings Inc. is a holding company.

9. The assets of Everi Holdings Inc. include the issued and outstanding shares of capital stock of Everi Payments Inc.

10. Everi Holdings Inc. is traded on the New York Stock Exchange.

11. Everi Holdings Inc. refers to itself and its consolidated subsidiaries as the "Company," "we," "us," and "our" in Securities and Exchange Commission filings.

**II.     The Gaming and Casino Industry**

12. Gaming facilities offer ATM and cash access services to their patrons through gaming kiosks, among other methods.

13. The gaming and casino industry is subject to certain state and local laws and regulations.

14. Gaming kiosks sometimes require regulatory approval by state or local gaming authorities.

15. Gaming kiosks may have the ability to integrate with certain casino systems.

16. Gaming kiosks are used in gaming facilities across the country.

**III.   The Arizona Department of Gaming Notice**

17. The Arizona Department of Gaming issued a *Notice of Intent to Deny State Certification* to Global Cash Access, Inc. in 2009.

18. Exhibit B to the First Amended Complaint (D.I. 7-1, Exhibit B) is a true and correct copy of the Arizona Department of Gaming Notice.

19. Everi refers to the Arizona Department of Gaming Notice for a true statement of its contents.

20. GCA merged with Comdata in 1998, whereby it became part of the Global Cash Access family of services.

21. The Arizona Department of Gaming investigation of Global Cash Access addressed the involvement of USA Payment Systems, which was founded by Robert Cucinotta and Karim Maskatiya and Tom and Jerry McCarley in 1996.

22. Thomas and Jerry McCarley were involved in implementing certain types of 'rollover' (aka '3-in-1' or 'quasi-cash') transactions for or on behalf of Global Cash Access (later Everi).

### IV. The '792 Patent and NRT

23. Exhibit A to the First Amended Complaint (D.I. 7-1, Exhibit A) is a true and correct copy of the '792 Patent.

24. The named inventors of the '792 Patent are Robert Cucinotta and Karim Maskatiya.

25. Everi filed a complaint on May 1, 2015, in the United States District Court of Nevada accusing NRT of infringement of the '792 Patent.

26. Exhibit C to the First Amended Complaint (D.I. 7-1, Exhibit C) is a true and correct copy of the Nevada action.

27. On March 25, 2016, the United States District Court for the District of Nevada held that the '792 Patent was invalid.

28. Exhibit H to the First Amended Complaint (D.I. 7-1, Exhibit H) is a true and correct copy of the order invalidating the '792 Patent in the Nevada action.

29. Everi voluntarily dismissed its action against NRT in the District of Nevada on October 24, 2017.

30. Everi did not appeal the invalidation of the '792 Patent by the United States District Court for the District of Nevada.

31. Everi brought an action before the United States International Trade Commission against NRT on May 4, 2015.

32. Exhibit D to the First Amended Complaint (D.I. 7-1, Exhibit D) is a true and correct copy of the International Trade Commission action.

33. Exhibits E and F to the First Amended Complaint (D.I. 7-1, Exhibits E and F) are true and correct copies of decisions issued by the United States International Trade Commission

85098689.1

in the International Trade Commission action brought by Everi, including a May 22, 2016 finding that the '792 Patent was invalid.

34. Everi voluntarily withdrew its complaint against NRT at the International Trade Commission on June 1, 2016.

35. Exhibit G to the First Amended Complaint (D.I. 7-1, Exhibit G) is a true and correct copy of the International Trade Commission allowing the International Trade Commission action to be withdrawn on June 2, 2016.

36. Everi did not appeal the invalidation of the '792 Patent by the United States International Trade Commission.

**V.     The '792 Patent and Prior Litigations**

37. The claims of the '792 Patent encompass methodologies that were well-known at the time of the alleged invention of the '792 Patent, including handling more than one transaction type.

38. Everi previously took the position that a "first type of transaction" should be construed as "an electronic fund transaction where money or an item of value is provided."

39. Everi previously took the position that a "second type of transaction" should be construed as an electronic fund transaction where money or an item of value is provided, and which is of a different type of transaction than the first type of transaction

40. Any prior art system would be but-for material to prosecution that disclosed conventional prior art processes in which a user attempts to use a payment card (e.g., an ATM or credit card) at a terminal and receives a denial of a charge; allowing two different transaction types from the same terminal; an account-holder being asked whether a second type of transaction should

be initiated; and a money location separate from the terminal is asked to provide money or an item of value to the account holder.

41. One of skill in the art relative the '792 Patent would have a Bachelor's degree in Computer Science, or equivalent work experience, and about 2-3 years of practical experience (or comparable and/or equivalent training), including familiarity with ATM or point-of-sale (POS) processing and debit and credit card transactions.

42. The '792 Patent was asserted against companies other than NRT.

43. On April 12, 2001, the '792 Patent was asserted against Hotel Ramada of Nevada.

44. The Hotel Ramada of Nevada litigation was settled given changes to screen displays by Hotel Ramada of Nevada that required re-swiping a card or initiating a new transaction.

45. On October 22, 2004, the '792 Patent was asserted against U.S. Bancorp; Certegy, Inc.; Certegy Check Services, Inc.; Game Financial Corporation; and Gamecash, Inc.

46. The U.S. Bancorp litigation was settled given changes to screen displays by U.S. Bancorp. that required re-swiping a card or initiating a new transaction.

47. The United States District Court for the District of Nevada invalidated the '792 Patent on March 25, 2016.

48. Everi was advised by counsel for NRT that "prior art exists that was well known to your client and the patent's inventors" on July 20, 2015 in a true and correct letter attached to the First Amended Complaint as Exhibit I (D.I. 7-1, Exhibit I).

49. Exhibits E and F to the First Amended Complaint (D.I. 7-1, Exhibits E and F) are true and correct copies of decisions issued by the United States International Trade Commission in the International Trade Commission action brought by Everi, including a May 22, 2016 finding that the '792 Patent was invalid.

50. The NRT methodology accused of infringement of the '792 Patent by Everi required a re-swipe.

## VI. Prior Art to the '792 Patent

51. Multiple companies were offering a terminal with at least the capability to connect two different payment networks more than one year prior to filing of the application that became the '792 Patent and using the methodologies that were well-known at the time of the alleged invention of the '792 Patent.

52. Everi (then Global Cash Access) was one of those companies offering a terminal with at least the capability to connect two different payment networks; it offered the Global Cash Access System more than one year prior to the application that became the '792 Patent.

53. The Global Cash Access System exhibits each element of the independent claims of the '792 Patent.

54. The Global Cash Access System is the same system disclosed and discussed by the Arizona Department of Gaming.

55. The Global Cash Access System was material to the examination of the application that became the '792 Patent.

56. The Global Cash Access System was known to the named inventors of the '792 Patent before and during prosecution of the application that became the '792 Patent.

57. The Global Cash Access System was not disclosed to the United States Patent Office at any time during prosecution.

## VII. Prosecution of the Application that Became the '792 Patent

58. The patent attorney that prosecuted the application that became the '792 Patent had a standard practice to inform inventors and their principals of the requirements of Patent Office Rule 56, which imposes a duty of candor and disclosure.

59. There is no evidence that the patent attorney that prosecuted the application that became the '792 Patent deviated from his standard practice in this regard.

60. The patent attorney that prosecuted the application that became the '792 Patent never received any prior art or other information for disclosure to the Patent Office from the named inventors of the application that became the '792 Patent—Robert Cucinotta and Karim Maskatiya.

61. The patent attorney that prosecuted the application that became the '792 Patent never received any information from the named inventors of the application that became the '792 Patent that involved the Global Cash Access System.

62. The patent attorney that prosecuted the application became the '792 Patent never received any information from the named inventors of the application that became the '792 Patent that involved the transactions at issue in the Arizona Department of Gaming Letter and involving the Global Cash Access System.

63. The named inventors of the '792 Patent did not invent the claimed subject matter of the '792 Patent—Robert Cucinotta and Karim Maskatiya.

64. The named inventors of the '792 Patent— Robert Cucinotta and Karim Maskatiya—nevertheless falsely submitted a declaration of inventorship to the U.S. Patent Office suggesting to the contrary.

65. The failure of the named inventors of the '792 Patent to disclose material prior art to the U.S. Patent Office and to falsely represent their inventorship was made with intent to deceive the Patent Office into granting a patent.

## VIII. Sham Litigation Involving the '792 Patent

66. In addition to the proceedings against NRT, Everi and its predecessors were involved in proceedings with third parties related to the '792 Patent.

67. USA Payments, a predecessor in interest of Everi, asserted the '792 Patent against Hotel Ramada of Nevada d/b/a Tropicana in C.A. 3:01-cv-1450 (N.D. Cal.).

68. USA Payments, a predecessor in interest of Everi, asserted the '792 Patent against U.S. Bancorp et al., C.A. No. 2:04-cv-01470 (D. Nev.).

69. In response to Everi's threat to assert the '792 Patent against it, Sightline Payments, LLC filed a complaint against Everi alleging patent abuse and anticompetitive conduct in C.A. No. 2:10-cv-00397 (D. Nev.).

70. In response to Everi's threat to assert the '792 Patent against it, Automated Systems America, Inc. filed a complaint against Everi alleging patent abuse and anticompetitive conduct in C.A. 2:10-cv-04973 (C.D. Cal.).

71. The '792 Patent was asserted by Everi and its predecessors despite them and their principals knowing of its fraudulent procurement.

72. The '792 Patent was also asserted by Everi and its predecessors despite them and their principals knowing that the scope of the claims as understood by Everi were not met by those parties accused of infringement, including NRT.

73. Everi believed that requiring the user to swipe a card a second time to initiate a second transaction avoided infringement of the '792 Patent.

85098689.1

74. Everi referred to avoiding a re-swipe as "automatic rollover."

75. Everi sued third-parties for infringement of the '792 Patent despite those companies not having automatic rollover (i.e., requiring a further swipe to initiate a second transaction).

76. NRT kiosks require a second swipe to initiate a second transaction.

77. Everi knew that assertion of the '792 Patent or threats of assertion would discourage casinos from acquiring products and services from parties other than Everi.

78. Everi told competitors that only Everi could offer rollover transactions and that attempts by such competitors would constitute infringement.

79. Everi continued to threaten to assert the '792 Patent after it was invalidated by the District of Nevada and the International Trade Commission.

## IX.  Market Definition

80. The products at issue in this matter are unmanned, integrated kiosks including related software and providing cash access services to casino patrons on gaming facility floors, including, but not limited to, Point of Sale ("POS") debit and credit card cash advance, and certain automatic teller machine ("ATM") transactions.

81. U.S. casinos and other gaming facilities purchase these kiosks and their accompanying services to provide cash to their patrons.

82. Patrons, in turn, use the cash provided by these kiosks to participate in gaming activities.

83. These kiosks are unique in their ability to provide cash advance services (*i.e.,* POS and credit card transactions), and, as such, they provide unique value to casinos and gaming facilities that cannot be provided by other means.

84. The relevant antitrust market is the foregoing kiosks providing cash access services within U.S. casinos.

85. The relevant product market includes the physical kiosk itself and the provision of ongoing cash access services over a contract term, including ATM transactions and cash advance transactions (credit card and POS debit).

86. The relevant product market is distinct from other in-casino cash access products and services, namely, standalone ATM machines.

87. The relevant geographic market is the United States, and casinos within it, which is distinct due to many regulatory and institutional barriers.

**X.   Market Power**

88. Everi historically attained a dominant market share.

89. Everi had a monopoly and attempted to grow and maintain its market share in the relevant market for said kiosks.

90. Over the past two decades, Everi maintained that dominant position, at least in part, due to its acquisition and use of the '792 Patent.

91. In the past and most recently against NRT, Everi used patent-related conduct in an effort to protect that dominant position.

92. Everi's conduct, including initiating multiple sham patent-related litigations, attempted to prevent competitors from offering their own kiosks and services and, when competitors were able to offer their own kiosks, ensured Everi maintained a favored position in negotiations and faced reduced competition on the merits.

93. As a result of this diminution of competition, prices to customers were higher than they otherwise would have been, a clear demonstration of antitrust injury to customers, competition, and the market.

94. Everi held significant market power in the relevant market in 2012.

95. This significant market power is reflected by high market shares, barriers to entry, and documents and testimony by Everi.

96. Everi was able to charge supracompetitive prices, which is direct evidence of substantial market power.

97. Everi and its predecessors have sought to enforce the '792 Patent multiple times, including two lawsuits against NRT.

98. Everi used the '792 Patent extensively in its efforts to market to and win casino customers.

## XI. Damages

99. Everi's conduct with regard to the '792 Patent is anticompetitive.

100. Everi's patent lawsuits directly raised barriers to entry and raised rivals' costs, both of which inhibited, delayed, and lessened competition.

101. Everi used the '792 Patent directly and the patent lawsuits indirectly as means to gain bargaining power over casino customers, further lessening competition.

102. Everi's lessening of competition served to raise prices and inhibit customer choice, both of which directly harmed customers and, in turn, consumers.

103. Everi's conduct has had measurable, significant effects on NRT's ability to grow its sales, limiting competition from NRT and, in turn, lessening competition in the relevant market.

104. NRT's growth rate was slowed from 2012 to 2015, as compared with its growth after the '792 Patent's original expiry date from 2018 to 2021.

105. Everi's frequent use of the '792 Patent in casino marketing materials and pitches increased Everi's bargaining power and reduced NRT's ability to compete.

106. After Everi twice sued NRT for infringing the '792 Patent and proceeding until roughly the original expiry date of the '792 patent (from 2015 to 2018), the effect of Everi's conduct intensified.

107. NRT's growth effectively ceased for the three-year period from 2015 to 2018.

108. After 2018, when the '792 patent expired and Everi's misuse of the patent ceased, NRT has resumed its growth at a faster rate than in any prior period.

109. Everi's prices were supracompetitive in 2012 and have fallen as Everi has been exposed to competition.

110. Everi's conduct delayed expansion of competitors and, in turn, slowed the rate of Everi's price decreases, evidencing Everi's efforts to lessen price competition.

111. Everi's conduct has impeded customer switching, lessening customer choice and preventing customers from moving to a preferred supplier.

112. Due to Everi's conduct, NRT has suffered damages.

113. But for Everi's conduct, NRT would have achieved the growth rate it experienced from 2018 to 2021 from the start upon entry.

114. Based on that growth rate, after nine years on the market as an independent supplier of kiosks, NRT would have attained 27% market share, whereas it actually attained only 17% market share.

115. Everi's conduct suppressed NRT's growth, and NRT lost profits.

85098689.1

116.    The lost profits are the measured based on the difference between NRT's but-for market share and its actual market share each year.

117.    NRT suffered $54.3 million in damages arising from lost sales and, in turn, lost profits.

118.    NRT's legal fees from defending the two patent lawsuits are costs NRT would not have incurred but for Everi's conduct and amounted to roughly $2.3 million dollars.

119.    NRT's total damages are $56.6 million.